## FISCHER & PORTER CO. v. BROOKS ROTAMETER CO.

Civ. A. 8710.

United States District Court
E. D. Pennsylvania.

Sept. 8, 1952.

Leonard L. Kalish, Philadelphia, Pa., for plaintiff.

Frank H. Borden, Philadelphia, Pa., and J. Edward Shinn, Ralph L. Chappell, New York City, for defendant.

KIRKPATRICK, Chief Judge.

This is an action at law for damages for infringement of U. S. Patent 2,441,350 to Fischer, for a metering tube for use in a rotameter (Claim 1) and for the rotameter itself (Claims 2 and 3). The case was tried to the Court and a jury. It was stipulated by counsel that the verdict was to be taken on three issues only, namely, "whether the patent involves invention, whether Mr. Fischer was the first and original inventor, and damages in the event of a verdict for the plaintiff", all other issues of fact and law to be determined by the Court without a jury.

The jury found a verdict for the plaintiff and awarded damages in the amount of $14,177.36. The defendant now moves to set aside the verdict and for judgment under Rule 50(b), Fed.Rules Civ.Proc. 28 U.S. C. and upon the entire record including the issues reserved for the Court.

It may be taken as the law, until the Supreme Court rules otherwise, that the question of invention is one of fact. Ryan Distributing Corp. v. Caley, 3 Cir., 147 F.2d 138. In that case and in the very recent one of Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971, the Court of Appeals for the Third Circuit had occasion to consider the power of the Court to direct or set aside verdicts in patent cases. In the Ryan Distributing case, the Court stated [147 F.2d 140], as the rule for civil cases, that "a verdict will normally be directed where both the facts and the inferences to be drawn therefrom, as supported by the overwhelming weight of the evidence, point so strongly in favor of one party or the other that the court feels reasonable men could not possibly come to a contrary conclusion", and went on to say that in a patent case perhaps the judge's power goes further than this minimum, but found it unnecessary to say how much further. In the Packwood case [195 F.2d 973], the Court defined the judge's power in this respect, saying that judgment n. o. v. might be entered where "the court's application of defining principles reveals 'a clear-cut case of lack of invention'", and where "consistent with controlling standards, the device in suit plainly could not embody invention." These opinions rather strongly imply that in a patent case it would be the Court's duty to set aside a verdict of invention even though there might be some evidence to support it, if such evidence is slight and the evidence against it compelling. However, the present case does not call for ascertainment of the outside limits of the judge's power in a patent case. Certainly, it is no less than in other civil jury trials and the ordinary rule applies, namely, that where all the evidence, taken in its most favorable light for the plaintiff, with all disputed fact questions and inferences resolved in his favor, leaves the plaintiff's case wholly unproved a verdict must be directed. The present case is, I think, such a case.

The patented mechanism in the present case is an assembly of old elements. Each

of the three major elements of which it is constituted is to be found in the prior art in almost exactly the form in which it appears in the patent. This is undisputed. The three elements are the tapered glass tube, the float and the guides.

Each element functions in the patented assembly in the same way in which it did in the prior art combinations in which it is to be found—the tube as in all tapered tube rotameters, the float as in the Cox '849 patent and several others, and the narrow convex glass ribs providing a point guide for the float exactly as in the Feldkamp patent 1,525,985.

The tube shown in the Cox '800 patent is in all respects the tube of the patent in suit, except that its guiding ribs are wide and have concave guiding surfaces, conforming to the circular shape of the float. What the plaintiff did was to take a Cox tube and remodel it so that instead of rather wide concave surfaces, the float would be guided by the points at the top of comparatively narrow convex ribs, which took the place of Cox's.[1] These were in all respects the ribs or bead guides of Feldkamp and several other earlier patents.

Having introduced its patent into evidence, together with an explanation of its place in the art accompanied by a courtroom demonstration, the plaintiff rested. The defendant then introduced evidence consisting of prior art patents and devices and expert testimony all of which, if accepted, would negative invention and require the direction of a verdict, even against the normal presumption of validity arising from the grant of the patent. It then became incumbent upon the plaintiff to meet this testimony.

The plaintiff presented testimony to the effect that the patent produced new results of great practical and commercial value by which, the plaintiff contended, the whole group of old elements exceeded the sum of its parts, added to the sum of useful knowledge, and gave the character of invention to the assembly. See Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S.

147, 152, 71 S.Ct. 127, 95 L.Ed. 162. This evidence consisted principally, although not entirely, of the testimony of the plaintiff's expert witness, Platt.

One of the new results which Mr. Platt found to have been achieved by the patent was the greater freedom of up and down movement of the float by reason of the use of line guides as opposed to the wider concave guides of Cox. This he characterized as "not a very strong point" and, evidently accepting this estimate, the plaintiff has made very little of it.

Another was the fact that the mandrel upon which Cox's tubes were made was a rather difficult machine job whereas, with the Fischer tubes, the mandrel was comparatively easy to machine, with the result that the Cox tubes would require a great deal more care in manufacture to attain the same accuracy as the Fischer tubes. He did not say, however, that the Cox tubes, as manufactured, were not as accurate as Fischer's within a certain range. In fact, he agreed that they were.

There is no doubt that the Fischer tube is easier and simpler to make than the Cox tube, not only because the machining of the mandrel upon which it is formed is a much simpler job but also because it is easier to draw or press the glass down into the grooves of the mandrel used in making Fischer's instrument than into the more pronounced recesses of the mandrel on which the Cox tubes are formed. The result is that the instruments can be manufactured comparatively cheaply while still maintaining a good degree of accuracy. All this makes for salability to industry. All authorities agree, however, that ease and cheapness of manufacture are not ordinarily the kind of new result upon which invention can be predicated. It is, of course, proper evidence to be considered in evaluating the usefulness of the patent in its field.

The main point made by the plaintiff's expert, and the one upon which the issue of invention chiefly centers, was the fact that the Fischer rotameter attained a high de-

---

1. It is to be remembered that the ribs of both tubes were of glass molded as an integral part of the whole tube.

gree of immunity to viscosity changes in the liquid to be measured, without using wire guides. In viscous liquids, viscosity will increase or decrease with changes in temperature and rate of flow. These changes cause variations in the position of the float from which readings are taken and frequent calibration will be necessary. It was conceded that wire-guided floats could be shaped so that the float would show less response to viscosity changes in the liquid to be measured than in any other type of rotameter. However, the wires tend to become corroded and to pick up deposits of matter from the liquid.

The greater viscosity immunity range of the Fischer instrument the witness attributed entirely to the substitution of the smaller convex ribs for the comparatively wide concave-surfaced ribs of the Cox patent, and he explained how the larger volume of liquid which Fischer's ribs allowed to act upon the float resulted in reducing the effect of viscosity changes, supporting his conclusions by references to the principles of hydrodynamics.

One cannot read this testimony of Mr. Platt, upon which the plaintiff chiefly bases its case, without being convinced that the point at which, in his opinion, invention really was to be found is nothing more or less than the reducing of the bulk of the guide means, so that they would occupy a smaller cross section of the tube and allow a less obstructed passage around the float for the liquid impinging upon it. That, he said was what increased the "turbulent" flow, which increase was what was needed to offset the effect of laminar flow and so help to reduce viscosity sensitivity. In other words, the point-guide feature of the ribs had little or nothing to do with it and their convexity was important solely because that shape left more space in the tube for the liquid. He did not stress the fact that Fischer reduced the number of ribs from four, in Cox, to three, in his instruments as manufactured and sold. It may be noted, however, that the claim does not suggest any number but calls for a "plurality".

That the view of the plaintiff's expert testimony which I have just expressed is correct seems to be almost conclusively established by Platt's testimony in answers to questions by the Court.

"Q. The exemplification in the drawing showed three (ribs). Now, suppose you increased that to twelve or fifteen, wouldn't you be getting very close in results to the Cox patent? A. Yes, you would, your Honor.

"Q. There would be hardly any difference if you got enough of those guides in there, would there? A. I should think you would get very nearly the same result if you put enough of them in."

To support its position that this extension of the range over which viscosity immunity is present was an inventive contribution to the art, the plaintiff points to the efforts of Cox, a highly skilled engineer, extending over a period of 25 years, which resulted in the development of a rotameter which fell substantially short of the Fischer device in range of viscosity immunity. Of course, Cox's main objective was a high accuracy instrument for laboratory use, but there seems to be little doubt that Fischer's greater range of viscosity immunity gives his instrument a very considerable advantage as an article of ordinary industrial use. In connection with this, the evidence shows that the Fischer rotameter has had a substantial degree of commercial success. It is also a fact, for what it is worth, that in this case the defendant, although licensed under the Cox patents, chose to court an infringement suit by making and selling the device of the patent in preference to any other.

Thus, the plaintiff's evidence may be taken as establishing that the rotameter of the Fischer patent has a greater range of viscosity immunity than that of the prior art instruments, that it is more satisfactory for industrial uses, that it is easier to make and that it can be sold more cheaply. Does all this sum up to invention? I do not think that it does.

The plaintiff does not contend that the rotameter of the patent gives complete immunity to viscosity changes. Its own court room demonstration showed beyond ques-

tion that it did not. Compared with a wire-guided instrument, the plaintiff's rotameter showed a variation of about 20 per cent as the viscosity of the liquid was changed, and I do not know that even the wire-guided instruments are 100 per cent immune. The plaintiff's expert testified to a series of tests with the rotameters of the Cox and Fischer patents which showed that, while both instruments had satisfactory viscosity immunity through their respective ranges, the range of the Fischer instrument was some 20 to 25 per cent greater than Cox. Within its range, the Cox was perhaps somewhat more accurate, as shown by Platt's description of the performance curves of the two. The longer range of Fischer no doubt made his rotameter more satisfactory industrially, but there is no evidence that the Cox rotameter would be unsatisfactory in that field. There is evidence that it has been used industrially for test purposes. Thus the difference between Cox and Fischer is one of degree.

■ Obviously, where a patent consists entirely of old elements, each one functioning in a manner in which it has always functioned, no new functional relationships are established and the attribute of invention can be found only in the result which emerges. If the new result is in degree of efficiency only, there is, ordinarily, no invention. So we are met at the outset with a purely objective consideration. If the novelty of the result is merely one of degree—doing the same thing that the old combinations have done only doing it more efficiently or more cheaply—there is, in the ordinary case, no invention and no need to go further and try to evaluate the subjective quality of the conception.

■ Of course, cases may be found in which the fact that the claimed contribution to the art is wholly a matter of degree will not necessarily negative invention, but they are rare. The rule has been well stated by the Court of Appeals for the Sixth Circuit in United Specialties Co. v. Industrial Wire Cloth Products Corp., 186 F.2d 426, 429, " * * * it has never been thought that mere difference of degree denotes invention except, perhaps, in those rare cases where the difference in degree is so marked and involves the solution of a problem long recognized but not earlier solved, so that a difference in degree becomes, in effect, a difference in kind."

■ In the present case, evidence is wanting from which it could be found that Fischer did more than carry the improvement in viscosity immunity of rotameters somewhat beyond Cox, and that in the matter of range, rather than effectiveness within range. It is not pretended that he accomplished a complete solution of the problem or a complete elimination of the difficulty. He made a somewhat better and more salable instrument for industrial use but there is nothing to show any such critical difference in degree as to make the operation of his rotameter, in effect, a difference in kind.[2]

■ There is no need to consider the testimony of the defendant's expert or the defendant's court room demonstration. Resting the conclusion entirely upon the plaintiff's own evidence taken in connection with the undisputed prior art, it is my opinion that no more was shown than an unpatentable improvement and that evidence of invention sufficient to warrant submission to a jury was wanting[3].

2. "The grant of the patent, the public acceptance of the article, its copying by plaintiff, plaintiff's seeking an improvement patent thereon, economy of production, expert testimony to the effect that it was not obvious to those skilled in the art, these are all evidence tending to show invention. But they do not conclusively indicate invention as defendant urges. Such evidence, when doubt exists, may resolve that doubt in favor of him who submits it, but where as here

there is a clear-cut case of lack of invention such evidence cannot successfully controvert it." Ryan Distributing Corporation v. Caley, supra, 147 F.2d at page 142.

3. In Ryan Distributing Corporation v. Caley, supra, 147 F.2d at page 141, the Court held the " * * * presumption of validity does not necessitate the submission of the question of invention to the jury if the patent appears to the court to be plainly invalid".

The patent having been found invalid, it follows that the verdict must be set aside and the defendant's motion for judgment under Rule 50(b) granted. However, the parties are entitled, in the event of an appeal, to have the Court's rulings upon the other questions presented.

■ The issue whether Fischer or Diament first conceived the idea of the patent in suit was a clear-cut fact issue with substantial evidence upon each side. It was properly submitted to the jury. The plaintiff's evidence upon the question of damages was sufficient to support the jury's verdict in that respect.

■ One issue of law reserved for determination by the Court was whether the patent is invalid because the claims are indefinite. As has been pointed out, according to the plaintiff's expert, which is the only testimony produced by the plaintiff upon the point, the improvement in viscosity immunity which the plaintiff claims as the new result arises from the size and number of ribs rather than their shape. In other words, for a tube and float of given dimensions the more fluid you allow to flow through the tube the wider will be the range of viscosity immunity. Platt said in effect that if enough of the bead guides of the Fischer type were used there would be hardly any improvement over Cox.

Upon this vital point the only thing to be found in the claims is that there shall be a "plurality" of ribs and that they shall have "relatively small circumferential dimension". I am aware that in a number of cases (cited by the plaintiff) such terms as "relatively small" or "relatively thin" have been held to be a sufficient compliance with the statutory requirement that the patentee "particularly point out and distinctly claim" his invention. However, in many other cases the opposite conclusion has been reached. Usually it is a matter of reading the claims in connection with the specification for qualification and definition. Each case presents a different question.

In the present case I find nothing in the disclosure of the entire patent which would tell the public what they can do to avoid infringement in this respect or where infringement begins. The rule is not a technical one but made to protect the public and keep the patentee from taking an advantage to which he is not entitled.

I conclude that the claims are invalid for want of definiteness.

■ The only other issue reserved for determination by the Court requiring extended consideration is the defendant's contention that the subject matter claimed in the patent was actually the conception of Cox and not Fischer.

The claims call for "a plurality of circumferentially-spaced transversely-protruding axially-extending float-guiding beads formed on the inner wall thereof, said beads having convex cross-section and having relatively small circumferential dimension." Whatever virtue the patent has resides in the elements so described, and Cox's conception of flutes or ribs for his tube was something entirely different.

The facts are that prior to November 1940 Cox had sent Fischer a mandrel or mandrels upon which Fischer was to form tapered glass tubes. Fischer made a tube and sent it to Cox. This tube, Cox found, did not conform to the mandrel because the glass had not flowed uniformly around the corners of the flutes. To meet this difficulty, Cox made up a sketch of proposed changes in the mandrel which he sent to Fischer. This sketch merely showed the corners of the flutes slightly rounded off. The surfaces which the flutes presented to the float were still definitely concave as in the original mandrel, and though not quite so wide as they had been, still had large, rather than "relatively small", circumferential dimension. On November 23, Cox wrote Fischer a letter in which he referred to the sketch, saying, "Since we do not require a wide land for the guide" etc.

Following this correspondence, the mandrel was changed in accordance with the sketch and 160 to 170 tubes were manufactured from it by Fischer and sent to Cox during 1941 and 1942. These tubes had numerous imperfections. The main trouble was that the guiding surfaces were not smooth from top to bottom. In addition,

1016

the glass had not flowed closely onto the guiding surfaces of the ribs with the result that, in some of the tubes, some of the ribs, instead of having concave guiding surfaces to conform to the mandrel, had slightly convex surfaces. At these points the float would have a line guide.

Cox used the tubes. In his testimony he said that the convexity of some of the ribs was not important, but he never said he wanted or intended that the guiding surfaces should be anything but the concave guiding surfaces which the mandrel should have produced.

On March 3, 1941, Fischer sent a memorandum to Diament, his sales representative. He enclosed part of a page of an advertising pamphlet which showed an artist's drawing of a cross section of a tube having the wide ribs of the Cox tubes, but definitely convex surfaces. In his memorandum he referred to the drawing as "Mr. Cox's development of the fluted tube".

The fact is that Cox did not develop or intend to develop a tube with convex beads of small circumferential dimension. It may be that Fischer thought he did, but that does not change the fact that the tubes which Cox got were made unintentionally and did not conform to his mandrel and were not what he expected to get or wanted. Plainly, Cox was not the conscious originator of the idea of using convex ribs occupying a smaller part of the cross section of the tube.

What has just been said disposes of the defense that the claimed subject matter of the patent had been in public use or sold in the United States more than one year before the application. It is unnecessary to decide the disputed question whether the Cox and Bendix uses, proved by the testimony of the defendant's witnesses, Cox and Friedli, were public or private uses. If the rotameters which were so used do not embody the concept described in the patent, and I have found that they did not, they cannot be asserted against the validity of the patent.

I find no misrepresentations made by the plaintiff to the Patent Office in the course of prosecuting the patent which would invalidate it if it were otherwise valid.

Finally, I find that if the patent were valid the defendant's accused structure would infringe.

The motion for new trial is denied.

The defendant's request for allowance of attorney's fees is denied.

Judgment for the defendant.