John S. NACHTMAN, Plaintiff,

v.

JONES & LAUGHLIN STEEL CORPORATION, Defendant.

Civ. A. No. 8906.

United States District Court
W. D. Pennsylvania.

Aug. 4, 1955.

& Laughlin Steel Corporation, in its electro tin line has infringed four of plaintiff's patents, that is Reissue Patent 20,-788, issued July 12, 1938; Patent 2,240,-265, issued April 29, 1941; Patent 2,-459,674, issued January 18, 1949; and Patent 2,576,074, issued November 20, 1951. The defense was invalidity of the patents and noninfringement. The jury, in answering an interrogatory as to each patent, found that each was valid and infringed. In the general verdict on the issue of damages the jury found for plaintiff. That portion of the general verdict on damages is as follows:

"* * * we, * * * find the defendant guilty of infringement as charged and fixed royalties 2½% or $1,474,495.72 on estimated tonnage and price per ton from 1944 through 1949."

At the close of all the evidence, defendant moved for a directed verdict. Decision on this motion was reserved, except as to that part of the motion relating to an issue of misappropriation, which was granted. Judgment on the verdict was entered on February 28, 1955. Defendant filed a timely motion to set aside the verdict and judgment and for judgment for the defendant n. o. v., pursuant to the provisions of Rule 50(b), Fed.Rules Civ.Proc. 28 U.S.C.A. Defendant also filed a timely motion for a new trial.

Oral argument has been had on the motions. Prior thereto, it was suggested to counsel that they cite authorities on the weight and effect to be given the jury verdict on the issue of validity. On that question, counsel have been most helpful. Defendant's position is that in the circumstances of this case, the question of validity of the patents is solely for the court and the jury verdict should be given no weight or effect whatsoever. In support, defendant cites Ryan Distributing Corp. v. Caley, 3 Cir., 1945, 147 F.2d 138; Great A. & P. Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Packwood v. Briggs & Stratton Corp., 3 Cir., 1952, 195 F.2d 971, certiorari denied 344 U.S.

Patterson, Crawford, Arensberg & Dunn, Pittsburgh, Pa., Newmeyer & Bress, Washington, D. C., for plaintiff.

Blenko, Hoopes, Leonard & Buell, Walter J. Blenko, Walter J. Blenko, Jr., Pittsburgh, Pa., Edgar J. Goodrich, James M. Carlisle, Washington, D. C., for defendant.

WILLSON, District Judge.

This patent case was tried to a jury. Plaintiff, John S. Nachtman, in his complaint alleged that the defendant, Jones

844, 73 S.Ct. 61, 97 L.Ed. 657; Fischer & Porter Co. v. Brooks Rotameter Co., D.C., 107 F.Supp. 1010; and the opinion of Judge Marsh in Fraver v. Studebaker Corp., D.C., 112 F.Supp. 209, affirmed 3 Cir., 208 F.2d 794.

Defendant says the case is not one where the validity of the patents is contingent upon the resolution of disputed questions of fact. To the contrary, defendant says this is a case where legal rules and standards of patentability are to be applied to undisputed facts. In such circumstances the question of validity is to be determined solely by the court and the finding of the jury can have no weight or effect in the determination, says the defendant.

Plaintiff, on the other hand, takes a sharply contra position to defendant on the weight and effect to be given the jury verdict in this case. Plaintiff cites familiar and cardinal rules and says that they have application in this case, that is:

"(a) The Court must consider the testimony in a light most advantageous to the plaintiff, all conflicts therein must be resolved in plaintiff's favor and plaintiff must be given the benefit of every fact and inference in his favor deducible from the evidence. Van Sant v. American Exp. Co., 3 Cir., 1948, 169 F.2d 355; Patton v. B[altimore] & O. R. Co., D.C.W.D.Pa.1953, 120 F. Supp. 659; Grobengieser v. Clearfield Cheese Co., D.C.W.D.Pa.1950, 94 F.Supp. 402.

"(b) The Court is not free to reweigh the evidence and set aside the jury verdict, merely because the jury could have drawn different inferences or conclusions, or because the Court regards another result as more reasonable. McFadden v. B [altimore] & O. R. Co., D.C.W.D.Pa. 1951, 95 F.Supp. 255; Patton, supra.

"(c) It is the jury's sole and exclusive function and prerogative to evaluate the credibility of witnesses and select from the entire evidence that which is to be believed or relied upon. Gunning v. Cooley, 1930, 281 U.S. 90, 94 [50 S.Ct. 231, 74 L. Ed. 720]; Loew's, Inc., v. Cinema Amusements, 10 Cir., 1954, 210 F. 2d 86, 93. In so doing the jury alone must ' * * * consider many separate strands of circumstances, and from these circumstances * * * draw its ultimate conclusions. * * * ' Wilkerson v. McCarthy, 1948, 336 U.S. 53, 63 [69 S.Ct. 413, 93 L.Ed. 497]. And when the jury has done this

'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.' "

Plaintiff says that in a patent case it is a function of the fact finder to resolve questions: as to the equivalency of structures, Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; whether combinations of old mechanical constructions involve patentable new results, Williams Mfg. Co. v. United Shoe Machinery Corp., 1942, 316 U.S. 364, 62 S.Ct. 1179, 86 L.Ed. 1537; whether there was prior use, Webb v. Frisch, 7 Cir., 1940, 111 F.2d 887; whether the patent claim was sufficiently specific, Bank v. Rauland Corp., 7 Cir., 1944, 146 F.2d 19; which of conflicting experts is to be believed, Hazeltine Research v. Admiral Corp., 7 Cir., 1950, 183 F.2d 953, certiorari denied 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650; whether improvement involves mere mechanical skill or invention. Trico Products Corp. v. Delman Corp., 8 Cir., 1950, 180 F.2d 529.

▮ It is believed that Judge Hastie in the Packwood case has stated the correct view as to the weight to be given to the verdict of the jury in this case. He said, 195 F.2d at page 973:

" * * * A jury in a patent case is not free to treat invention

*as a concept broad enough to include whatever discovery or novelty may impress the jurors favorably.* Over the years the courts of the United States, and particularly the Supreme Court, have found meaning implicit in the scheme and purpose of the patent laws which aids in the construction of their general language. In this process, rules and standards have been developed for use as guides to the systematic and orderly definition and application of such a conception as invention in accordance with what the courts understand to be the true meaning of the Constitution and the patent laws. *Once such standards and rules are authoritatively announced any finding of 'invention' whether by a court or a jury must be consistent with them.* (Emphasis supplied.)

"This is no peculiarity of patent law. Jury findings of negligence or proximate cause must comport with common law rules devised to give reasonable and systematic meaning to those generalities. For such rules, see Restatement of the Law, Torts, Negligence, Chs. 12–16. And so it is throughout the body of the common law. This authority and responsibility to keep jury findings within reasoned rules and standards is an essential function of United States judges today as it long has been of common law judges. [Citing cases.] It stands as a great safeguard against gross mistake or caprice in fact finding."

 In considering the motion for judgment n. o. v., this Court has in mind the proposition that I—

" * * * was not free to reweigh the evidence or set aside the verdict because the jury might have drawn different inferences or conclusions or the court might have thought another result more reasonable, but must take the view of the evidence most favorable to the plaintiff. * * * " *Magee v. Gener-*

al Motors Corp., 3 Cir., 213 F.2d 899, 900.

Nevertheless, a review of all of the evidence and the law compels the conclusion that defendant's motion for judgment n. o. v. must be granted.

\* \* \* \* \*

As historical background of the issues raised in this case, a portion of an article under the name of plaintiff, John S. Nachtman, published in the trade magazine "Steel" on June 12, 1939, which publication is widely circulated in the steel industry and which article is in the evidence, is clarifying. The title of the article, the heading, name of author and a portion of the article are as follows:

"Title: Electrotinning Strip Steel

"Heading: New continuous electrotinning line fuses deposited tin coating to steel strip in an oil bath, giving excellent uniformity. Speeds up to 400 feet per minute with an output of 96 tons per 8–hour turn are obtained. Tin loss is practically eliminated.

"Author: John S. Nachtman
Manager
Electrochemical Processes Division
Blaw-Knox Co.
Pittsburgh

"When the 4-high strip mill established itself and when continuous methods began invading many phases of steel production, continuous electrotinning and plating of strip products became inevitable, particularly since basic principles of electroplating have been understood and the process applied commercially to a limited extent for three-quarters of a century.

"It may be considered that the continuous electrotinning process,

has been a long time in 'arriving'—but that is because there has been much of a new nature to develop. From 1927, when the writer supervised the installation of possibly the first continuous unit for electrogalvanizing wide steel, there has been steady research and development to attain the most efficient and economical electrotinning process. The early electrogalvanizing unit was directly followed by similar units for plating of strip with copper, tin, cadmium and nickel. All of these early installations had some initial success, which was encouraging, but there were fundamental problems which necessitated research in many directions.

### Difficulties Encountered

"Among the difficulties common to the continuous electroplating of all the coating materials mentioned were those involving: the application of current to the moving strip; cleaning of the strip surface prior to plating; special means of propelling the strip and guiding it through the various tanks; even distribution of the metal coating; and accurate coordination of the moving strip with the plating current. Even at that early date, these problems were solved in a manner which, although not entirely satisfactory, made the early installations commercially successful, except for the tinning process.

"The early electro-tinplate had the following limitations: the coating was too porous to afford sufficient protection for the base metal. The coating was too soft to enable satisfactory drawing or forming with the result that tin accumulated on the dies or rolls. The tinplate lacked lustre and had a dull matte finish.

"Continuous electrotinning of strip steel was proven in principle, however. Subsequent effort was devoted to solving these and other problems common to all continuous strip electroplating processes. It was also the objective to develop a better and more economical tin electrolyte and to perfect a number of electrotinning processes designed to meet varying conditions and requirements.

"Results of this 12-year program are summarized here. It is believed that continuous electrotinning of wide steel strip, or plating with ferrous or nonferrous metals or alloys, is now commercially feasible on a large scale, economical basis; and that it will now produce tinplate and other plated products which meet the most exacting requirements of consuming industries. * * *"

\* \* \* \* \*

Briefly, plaintiff says he has four combination patents, valid as such. They are: Patent Reissue 20,788; Patent No. 2,240,265; Patent No. 2,459,674; and Patent No. 2,576,074. Defendant takes the position that the four patents are each invalid as each patent is for a mere aggregation of old steps and arrangements and exhibits no patentable invention. Defendant says also that the presumption of validity arising from the granting of the patents is of no real weight in this case because: (1) the Patent Office had no knowledge of the most significant items of prior art when it granted the patents; (2) the file wrappers show that the Patent Office failed to recognize or apply the long-standing rule of law epitomized in the Supermarket case; and (3) other defenses involving proceedings before the Commissioner of Patents are inserted in defense of each of the patents respectively and which matters will be mentioned.

Having in mind that the evidence in the case is now to be reviewed on the basis that plaintiff is entitled to all the inferences and the evidence is to be considered in the light most favorable to him, because he has the verdict of the jury, there appears to be, on review of the evidence, no substantial controversy on the important issues in the case.

I. Evidence as to the Prior Art in General

Three statements in the "Steel" article are noticed particularly:

(a) "* * * basic principles of electroplating have been understood and the process applied commercially to a limited extent for three-quarters of a century.

(b) "* * * From 1927, when the writer supervised the installation of possibly the first continuous unit for electrogalvanizing wide steel, there has been steady research and development to attain the most efficient and economical electrotinning process.

(c) "Continuous electrotinning of strip steel was proven in principle, however * * *."

A brief résumé of the testimony of John S. Nachtman, plaintiff, is in order. Plaintiff has been a metallurgical engineer since 1922 when he graduated from the Colorado School of Mines. He first worked at the American Steel and Wire Company at Cleveland where he became acquainted with the methods used in the manufacture of cold rolled strip steel. At American he assisted other engineers on a number of metallurgical problems, such as annealing, cleaning and pickling strip steel, and was concerned also with the problems of lubrication and rolling. He next became associated with the John A. Roebling Company at Trenton, and his work there consisted of improving the Roebling methods of rolling, cleaning and pickling steel strip and of devising economical methods of operation. In 1929, plaintiff became associated with the Thomas Steel Co. as superintendent of plating and finishing, and that year he installed an experimental line for developing techniques and methods for producing electro tin plate in a continuous process. In 1931 or 1932 he installed for Thomas a continuous electroplating tin line for continuous strip, which was commercially successful.

Plaintiff said that when he went to Thomas in 1929, this company was in the process of installing an electrogalvanizing line which it had purchased from the Meaker Company. Electrogalvanizing is a process for the electroplating of zinc on the surface of steel strip. Plaintiff also says that the electro tinning line at Thomas was substantially as shown on his Re. 20,788. Plaintiff stated that at the Thomas Steel Co. there were lines for electroplating tin, zinc, copper and cadmium and that there was no difference in the lines except in the plating solutions. Plaintiff says that the processes of annealing, cleaning, pickling and electroplating steel strip were all old and well-known in the industry. In reply to an inquiry as to whether the strip at Thomas was under tension, plaintiff stated that it was under tension in view of the fact that it had to go through rolls and in order to do that it had to be pulled. At Thomas, however, plaintiff stated that the annealing and cooling facilities were not a part of the continuous process in the sense that they were placed physically between the pay-out reels and the plating apparatus, but the furnaces and cooling devices were in other buildings. Thus, at Thomas there was a box annealing furnace known as batch treatment, instead of a continuous treatment. Plaintiff states that his original Patent No. 1,-991,817 and Re. 20,788 differ from the Thomas installation in at least one respect, in that at Thomas there was a box annealing furnace and he shows a continuous furnace in his original patent. He says, however, that he has never installed a continuous annealing treatment through which the steel passes uninterruptedly to the electroplating bath. Plaintiff says also in that connection, that his drawings show a furnace which he had seen in his earlier work at Roebling Company, but that it was equivalent to everything that was going on as far as annealing was concerned. Plaintiff stated that annealing has no effect one way or another upon the plating operation, but annealing is for the

purpose of softening the base steel so that it may be worked into other shapes, such as the making of tin cans.

The testimony of witnesses Bursa, Kilroy and Hatfield is enlightening and important with relation to the early establishment of the wet processes of electroplating and is not contradicted in any material respect. Their testimony shows that the Acme Steel Company in Illinois commenced the installation of electroplating lines as far back as 1913. These were electro-galvanizing lines wherein zinc was deposited on steel strip varying from one-quarter inch to eight inches in width. The sequential steps at Acme started with what have become known as the "wet steps," that is pickling, rinsing, cleaning with wipes but later with brushes, electroplating, another rinsing, drying with wipes and coiling on reels. The process at Acme was made continuous by an electric motor operating a puller roll located just prior to final coiling, which puller mechanism was improved in later lines. The speed of the operation was controlled by step pulleys, which speed control was later improved by installation of a variable speed transmission. At Acme, continuity was secured by joining the strip; initially, by riveting prior to the entry into the pickling tank and afterwards by electric spot welding. At Acme the first line installed did not comprise a continuous annealing process. The steel was annealed separately in a furnace and brought to the line after it was cooled. In the later lines, the annealing was a continuous process in that the steel passed through a lead pan annealer. The heating agent was hot molten lead, through which the strip was drawn, with granular coal placed over the molten lead to prevent its contact with the air so that the strip steel was sealed in lead as it passed through the lead pan. It seems clear from the testimony relating to the Acme process, that the basis for its operations was the Meaker Company's drawings and specifications if not direct engineering service by Meaker.

Other than the public use at Thomas and Acme, defendant cites prior patents and publications as destructive of the validity of the patents in issue here. The prior patents and publications in evidence against Re. 20,788 are:

Aylesworth Patent 817,152 (DX 43, 44)
Kirschner Patent 1,539,577 (DX 45, 46)
Meaker Catalog (DX 47, 48)
Stahl and Eisen Article (DX 49, 50)
Madsenell Article (DX 51, 52)

Against Patent 2,240,265, defendant cites the same patents and articles above, and in addition the Acme prior use, particularly the brushing unit, Mascuch Patent 1,717,460 and Ferm Patent 2,141-382. Against Patent 2,459,674, defendant cites the Kirschner Patent, Mascuch Patent and Ferm Patent. Against Patent 2,576,074, defendant cites the Coe Patent 1,928,409 and Prentice Patent 2,007,614.

II. The Evidence Relating to the Object, Parts, Function and Purpose of Each of Plaintiff's Four Patents.

A. Patent Reissue 20,788

This is a reissue of Patent 1,991,817 and has but one claim, which reads as follows:

"I claim:

"In a process for producing tin plated steel strip, heating the strip to a temperature sufficiently high to anneal and temper the same, gradually cooling said strip while preventing contact with external air, joining portions of strip end to end to form continuous strip with good electrical contact at the joint, and moving the continuous strip uninterruptedly and at a substantially constant speed through the sequential operations of acid pickling, washing, electroplating in a tin bath in which the moving strip constitutes the cathode and passes between anodes distributed along the submerged portion of the strip, washing, and drying, said opera-

tions thus producing steel strip coated with an adherent and evenly distributed electrodeposit of tin."

Defendant says that this patent is for a mere aggregation of old steps and exhibits no patentable invention. Also, that the reissue is void because there was no compliance with the reissue statute. Defendant says there was undue delay in applying for the reissue and that the application shows no inadvertence, accident or mistake in taking out the original patent; also, that the reissue is void because it is for a different combination than the original, and since it does not appear on the face of the original patent that the patentee intended to include a batch annealing process, the reissue patent is invalid.

It is recognized that the claim in the reissue of itself must stand or fall on whether it sufficiently defines an invention independently of any other claims or any other patent of the plaintiff. Altoona Publix Theatres v. American Tri-Ergon Corp., 1935, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

It is noticed that in the original and in the reissue, the object of plaintiff's invention is to plate steel with a film or plating of other metal,—tin, for example, so as to secure an excellent product and to secure that product at a minimum cost. In describing the invention, plaintiff says the steel plate, being in thin plates or narrow strips or ribbons, is taken from a coil or reel and when coated wound back on a coil. In the evidence appear several references of plaintiff repeatedly embracing coatings of zinc, copper and tin as all being within his process. For instance, in the file wrapper of the reissue he asserts that his invention is "not in its broader aspect restricted to the plating of tin" and that "while tin is the preferred electro deposit, use of other metals was definitely contemplated by applicant." In the original and reissue patents, plaintiff does not confine himself to any particular apparatus, as he said it is to be understood that changes of construction and relative arrangement of devices and members of that apparatus may be made without departure from the invention.

In the original, the claim is described as a continuous process with the object of coating steel strips. The method or process consists in annealing, then cooling in successive stages. Next follows the process of cleaning, acid pickling, and washing the strips, in sequence, followed by electroplating with a coating of tin and then washing and drying the plated strips. Nothing is said here of the continuity of motion of the process or how it is to be obtained. The claim speaks of steel *strips*, not steel *strip*. It mentions cooling at successive stages rather than gradually cooling. The original patent, therefore, must be construed to embrace only some continuous process of annealing steel strips. Steel strips as used in the industry were known to plaintiff for years. The early electroplating process at Thomas and Acme joined steel strips end to end to make a long steel strip which was coiled on a reel. As plaintiff said in his article in "Steel," the advent of the 4-high strip mill made possible the long thin, but wide, steel strip. In the reissue, plaintiff speaks of steel strip only. Steel strips had to be joined to form a long steel strip. The 4-high mill made it possible, however, to manufacture long and thin steel strip wound on coils. Each, of course, requires a welding or joining process in any continuous electrotinning operation. In the reissue, the steps are heating the strip, gradually cooling the strip, joining portions of strip end to end to form a continuous strip; moving the continuous strip uninterruptedly and at substantially constant speed through the sequential operations * * * and then follows the wet steps. It is apparent, therefore, that the reissue permits the annealing to be done, as defendant does it, in a separate furnace away from the tin line. The heating for annealing purposes is not a part of the electroplating process within the claim of the reissue. This method was originally called "batch annealing," as at Thomas. But the original patent did not cover this

method. Only a continuous process for annealing the strips was embraced in the original process. Plaintiff concedes that batch annealing of itself is an old process. There is no invention in batch annealing as such. It is apparent also that lead pan annealing is not excluded from either the original or the reissue patent. No method for annealing is described, except that in the original patent it must be a continuous process. Thus we have a situation where the identical sequence of steps claimed in Patent Re. 20,788, but employed for the electrodeposition of *zinc*, was in prior use at Acme Steel Company. It is noted that at Acme batch annealing was the method used in the first zinc lines, but in the subsequent lines, annealing was continuous in a lead pan. It is true that plaintiff's witness Tour criticized the Acme lead pan as unsuitable if the strip was to be tin plated, but plaintiff says that his invention includes zinc plating as well as tin plating and the reissue patent does not exclude the use of lead pans, and if the invention consists in any part in the discovery that lead pans must not be used in tin plating, the patent is defective for not claiming the actual invention. Altoona Publix Theatres v. American Tri-Ergon Corp., supra, and Textile Machine Works v. Louis Hirsch Co., 1938, 302 U.S. 490, 58 S.Ct. 291, 82 L. Ed. 382.

The claimed sequence of steps in the Nachtman claim is, by the overwhelming evidence, old for the electrodeposition of zinc upon steel. In Re. 20,788, this court is unable to pinpoint any contribution to the art which would amount to an invention when applied to tin rather than zinc. Dr. Dean, plaintiff's expert, did not do so. He was asked to define a process. His statement was that " * * * a process is a combination of steps to produce a desired result * * *." He said that steps in a process claim " * * * are mechanical or chemical operations performed on some material * * *." The next question to him was:—"Q. And do I understand that the reissue patent, the claim of that patent, recites a series of steps by which you produce continuous electro tin?" His reply was:— "A. That is precisely my analysis, that there are here recited a series of steps which taken together produce a tinned strip. * * *" In speaking of all of plaintiff's patents collectively, Dr. Dean states: " * * * I would regard all of these descriptions as descriptions of the same thing, broadly. Namely, steps of a process and apparatus for producing tin plated steel in a continuous manner. * * *" Dr Dean goes on to say:

"Now, although all of them cover that entire subject from a descriptive standpoint, there is an attempt in each of the patents at least, to specifically designate certain steps, certain combinations of steps, or certain apparatus to which that particular patent directs possible users of that process. So that, while all of them are descriptions of electro tinning equipment, each one of them, with the exception of the Blaw-Knox submission, deals particularly with certain steps, certain parts of the process, or certain equipment for carrying out the process."

Thus, Dr. Dean, plaintiff's expert, does not indicate any parts or functions of plaintiff's devices which teach anything new or which add to scientific knowledge on the subject. It is apparent that plaintiff, as shown by his training, is a person skilled in the art and he made use of his skill but did not invent anything.

As a prior publication, the Stahl und Eisen article, published in 1916 in Germany, should be mentioned. It is entitled, "Manufacture of Metallic Coatings on Wrought Iron and Steel Wires, in Particular Their Galvanizing and Tinning." The article in large part deals with electrogalvanizing. The electrodeposition is zinc on other metal, particularly wires. In considerable detail, cleaning of the metal prior to the deposition is noticed and its importance stressed. However, in the translation

there are paragraphs headed, "Tinning," "Hot Tinning," and "Electrolytic Tinning." It is stated under this last heading: "* * * The same rules as for electrolytic galvanizing hold good for electrolytic tinning with respect to installation of tanks, reels, coilers, pickling and preparation of wires and other objects to be coated. * * *." The composition of baths and other materials to be coated is given in the literature references. Although the discussion on electrotinning is not as thorough and complete as on electrogalvanizing, yet the principle is set forth and especially it is noted that emphasis is placed on careful cleaning of the material to be coated with tin.

Thus it is apparent that in reaching its verdict on validity, the jury disregarded the material evidence on the issues as to Reissue 20,788. On examination of the evidence, including the evidence of prior use, prior patents issued, the known literature on the subject, and all of the testimony in the record, this court must inescapably come to the conclusion that there is no contribution to the sum of useful knowledge shown in the claim upon which to predicate a finding of invention. In giving consideration to the principles in Ryan Distributing Corp. v. Caley, supra; Great A. & P. Tea Co. v. Supermarket Corp., supra; Packwood v. Briggs &. Stratton Corp., supra; Fischer & Porter Co. v. Brooks Rotameter Co., supra; and Fraver v. Studebaker Corp., supra, it is evident there is no patentable distinction whatever between Nachtman's claim and the prior art disclosures. Also, a careful consideration of this same evidence shows that there is no showing of a new or surprising result or a result which is more than the mere sum of the expected result of the several steps. What was stated in the Supermarket case, 340 U. S. at page 153, 71 S.Ct. at page 130, applies to the patentee here: "* * * This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly. * * *"

And lastly, as to Re. 20,788, it is invalid as it is for a different combination than the original. The reissue attempts to broaden the original patent by including the step of batch annealing, omitted in the original patent. It is clear that Nachtman knew all about batch annealing prior to his original application. Thus, the parallel situation ruled on by the Supreme Court in United States Industrial Chemicals Co. v. Carbide Corp., 1942, 315 U.S. 668, on page 676, 62 S.Ct. 839, 843, 86 L.Ed. 1105 applies, where the court says:

"* * * If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original."

As to this portion of the case, it thus appears to me, as the trial judge, that the verdict of the jury was against the overwhelming weight of the evidence, regardless of any issue as to credibility of witnesses. The jury found, however, that patent Reissue 20,788 is valid. This amounts to a finding of "invention" but such a finding is contrary to the established standards and rules which must be applied in order to hold a combination patent valid.

B. Patent 2,240,265

Claims 1 and 2 are in suit. They call for wet mechanically cleaning the surface by a scheme which includes brushing, then electroplating, then removing electrolyte from the surface of the strip, then brightening the coating

by subjecting the surfaces of the coated strip to a medium such as hot oil which maintains the surfaces at a temperature sufficient to alloy the electrodeposit with the strip, and advancing the strip by a controlled tension.

. Defendant says this patent is invalid because:

1. The patent is for a mere aggregation of old steps and exhibits no patentable invention.

2. The "controlled" tension referred to in the patent means merely that the strip is advanced at a uniform rate and this is not patentable.

As to the first contention, defendant says that the steps individually and severally are old, and that the aggregation of them in the manner suggested by Nachtman is also old. Defendant cites the patents of Aylesworth, Kirschner, Mascuch and Ferm, also the Meaker catalogue, the Madsenell Article, and the Acme prior use, particularly the brushing unit. Included in the latter are defendant's exhibits 27 and 63. Exhibit 63 is an enlargement to scale of the arrangement of brushes and back-up rolls in the Acme machine. Again it is noticed that Nachtman, in the "Steel" article published in 1939, stated that " * * * continuous electrotinning of strip steel was proven in principle, however * * *." Also, that plaintiff has stated " * * * From 1927, when the writer supervised the installation of possibly the first continuous unit for electrogalvanizing wide steel, there has been steady research and development to attain the most efficient and economical electrotinning process * * *."

So that, an inquiry is now directed to the evidence to determine what survived, by way of novelty or advance over prior art, upon which to predicate a finding of invention in this patent.

On this patent, the issues at the trial were concerned largely with the brushing, brightening and tensioning processes. This patent and the reissue are the two process patents involved in the case, the last two being apparatus patents. It is to be noted particularly that prior literature as shown in the evidence, and in the specifications of this and other patents, as well as the Stahl and Eisen and Madsenell articles teach and emphasize that a prerequisite in the electrodeposition of tin is that the base metal must be thoroughly clean. The cleaning must be more thorough than is required in electrogalvanizing. The main object is to secure a uniform deposit of tin, but not only that, the finished product must be a bright tin.

The uncontradicted testimony of the witness Hatfield as to Acme prior use, shows that there was no material difference between the brushing done at Acme and the brushing method called for in this patent. As was said in Market Street Cable Railway Co. v. Rowley, 155 U.S. 621, 15 S.Ct. 224, 39 L.Ed. 284, it is impossible to read the claims without perceiving that the patent in suit has been clearly and repeatedly anticipated in its parts, function and purpose. As in that case, the Nachtman descriptions and drawings disclose some differences with the prior art but they do not disclose material differences. As noted, brushing, brightening and tension were problems of the art of long standing. Men of skill have devoted their attention to them as necessity required. Nachtman said, in his description, "* * * the alloying and burnishing operations as hereinafter disclosed are conducted by means of baths of hot and cold oil, but an alloying furnace of the reducing atmosphere type, and its adjuncts, may be employed for this purpose * * *." Thus, as to this patent, one is unable, after a consideration of all of the evidence, to pinpoint an "invention." Continuity of the operation is a desired object, and is, of course, stressed. Tension is stressed in order to secure uniformity of motion. But, plaintiff's expert, Dr. Dean, conceded that the purpose of tension is simply to provide a smooth flow through the system, that is, a uniformity or constancy of motion.

A brief comparison of Nachtman's patent with the prior art shows:

(a) Kirschner is specifically concerned with the making of bright tin-plate by electrodeposition. The basic material is sheet iron, either in the form of an endless band or lengths joined end-to-end so as to form an endless band.

(b) The first step of the Nachtman claim—wet mechanically cleaning—is effected in a device marked 3 in Kirschner's drawing, which device is described in the specification as "any known or preferred apparatus for removing any fatty matter from the bank, * * *" and this is followed by a rinsing process. The Acme brushing device is a good example of a "known or preferred cleaning device"; it embodies all of the minutiae stated in Nachtman's claims.

(c) The strip in Kirschner is a "continuously moving tensioned strip" as called for by Nachtman's claim because it is pulled through by the wind-up roller and, as admitted by Nachtman, you cannot advance a strip of this sort except by pulling upon it.

(d) The Nachtman claim next requires that the strip be passed into an electrolyte and electroplated. Kirschner does this in the electroplating bath.

(e) The claim next called for removing electrolytes from the strip surface. Kirschner does this with elastic rollers.

(f) The claim next calls for brightening the surfaces by subjecting them to a medium maintained at a temperature sufficient to alloy the tin with the strip. Kirschner brightens by passing the strip through a hot air furnace and then cooling it so that * * * "smooth, bright, electroplated goods are obtained having a coating free from pores and capable of resisting the action of air and moisture * * *".

(g) The operation of Kirschner is obviously a continuous one. He engages the strip along its length with various sets of rollers as well as winding it on the reel. Apart from that, however, the idea of applying propulsive power at different points along the way had long since been disclosed in Aylesworth 817,-152.

(h) Ferm Patent 2,141,382 was issued December 27, 1938, and is styled "Apparatus for Treating Plated Strip Metal." The apparatus claimed is one for the brightening of tin or other metal coating on strip steel by passing the coated strip through a hot oil bath in one chamber to soften, fuse and brighten the surface, downward through a connecting duct into a cold oil bath chamber to harden the brightened surface; the entire apparatus being arranged to prevent exposure of the strip to oxidizing atmosphere. Priority of the subject matter was litigated by Nachtman in the United States District Court for the District of Columbia, Civil Action No. 431–47, wherein Nachtman brought suit against the Commissioner of Patents under the Patent Law then in effect, Section 4915, R.S., 35 U.S.C.A. § 63.[1] The complaint was filed January 30, 1947, and judgment was entered July 21, 1948, dismissing the suit. In his complaint Nachtman contended, inter alia, that a patent should issue to him covering all or part of certain claims in an application (not involved in the case at bar) declared by Nachtman to be a division of his application Serial No. 133,911 (for Patent 2,240,265). These claims involved, for the most part, a method of brightening electroplated tin coatings by hot and cold baths of fluid, such as oil. The court held that these claims were not patentable in view of the patent to Ferm.

No appeal was taken in Civil Action 431–47. Plaintiff says that the case is of no significance on the present issue. It is apparent, however, that the hot oil fusion process of Ferm is substantially the same as Nachtman's, and that the judgment in that action is unfavorable to plaintiff's validity here. The oil treatment process described by Nachtman is, in all significant respects, the same as that granted to Ferm in a prior patent.

1. Now 35 U.S.C.A. §§ 145, 146.

The adjudication in that case does not control here, but it is believed nevertheless that the principle is old and cannot be the subject of a patentable invention by Nachtman.

As to the second contention of defendant, that is on the issue that controlled tension as referred to in the patent, means merely that the strip is advanced at a uniform rate and that this is not patentable, it is believed that the decision in Altoona Publix Theatres v. American Tri-Ergon Corp., supra, having to do with sound motion pictures, is directly against plaintiff. The alleged invention there consisted of the use of a heavy flywheel for advancing the film having the sound track thereon through the sound reproducing unit; the purpose was to insure the uniformity of motion essential to the correct reproduction of sound. In holding the patent invalid, the Supreme Court said, 294 U.S. at page 486, 55 S.Ct. at page 459:

" * * * The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skillfully this was done, and even though there was produced a machine of greater precision and a higher degree of motionconstancy, and hence one more useful in the art, it was still the product of skill, not of invention."

Accordingly, the same principles discussed in relation to the Reissue Patent 20,788 and the verdict thereon apply here and Patent No. 2,240,265 is, therefore, invalid as a matter of law.

### C. Patent No. 2,459,674

■ This is an apparatus patent. It it styled "Continuous Tinplate Brightening Apparatus." Plaintiff stated the primary object of the invention is to devise and provide apparatus for treatment resulting in the production of a surface coating which is uniform in thickness, smooth and bright in appearance, and firmly and uniformly united to the base metal. A second object is to provide for suitably tensioning or controlling the strip material while it is being treated, plated, brightened, etc., by providing in the apparatus or line for suitably proportioning the tension, speed and rate of treatment of the material, particularly while continuously moving the material through the line. Plaintiff says in his application that " * * * This desired control of tension *may be provided in various ways* as set forth more in detail in my above-mentioned prior applications, particularly in the application for my patent No. 2,240,265, granted April 29, 1941, and in my application, Serial No. 257,107, now abandoned, filed February 18, 1939 * * *." (Emphasis supplied.) He continues, stating that the tension may be secured by the driving of the guide rolls by motors that will operate the rolls in contact with the strip while preventing the undesirable building up of tension in the strip or by operating pinch rolls by motors in such a manner as to provide a "drag" tension, or by the provision of dancer rolls at suitable points in the line, or these various elements may be combined according to the needs and requirements of the operation and the speed of the line. Again the defense to this patent is that it is a mere aggregation of old elements and exhibits no patentable invention. Defendant says that this patent is addressed to a conjunction of devices for successively (a) heating the coating to a fusing temperature and (b) solidifying the coating, while (c) continuously moving the strip under tension. Defendant says there are other minutiae included in the claims but they are not of such nature as to import separate patentability. Defendant cites the Kirschner, Mascuch and Ferm patents.

The comparison made above between Kirschner and Nachtman patent 2,240,-265 is equally applicable here. The identity of Nachtman's scheme with the disclosures of Ferm is apparent from a mere comparison of Figure 5 of Nachtman's patent with Figure 5 of Ferm's. The general arrangement used by de-

fendant, and alleged to infringe, is shown in Mascuch, as Dr. Dean admitted. What has been said as to the law in our discussion of Re. 20,788 applies with equal force here. Patent 2,459,674 is void because it does not measure up to legal standards of patentability as defined in Supermarket and other cases.

Also, defendant says that this patent is void for double patenting over Nachtman patent 2,357,126. The present patent was granted January 18, 1949. Just five years before, plaintiff, on August 29, 1944, received his patent '126 which is a method patent. By comparison it becomes apparent that '674 states the same invention in terms of apparatus as '126 claims in terms of the method. The file wrapper of patent '674 shows that the claims were originally rejected on the ground of double patenting. It appears also by comparison that the main distinction between the two is the recital in the claim of patent '674 of moving the strip under tension. It is believed that the defendant's theory on this phase of this case is reasonable and correct. Defendant's counsel in his brief says:

"The Examiner who made the rejection correctly noted that tension was not new in the electroplating art, but his rejection was subsequently reversed in the Patent Office on the ground that the prior patents cited by the Examiner for the purpose of showing that tension was old in the art did not in fact show it, and the apparatus claims were consequently deemed to be patentably distinct from the method claims.

"It is self-evident that if Nachtman, instead of representing to the Patent Office that tension was new with him and important in the art, had made the concessions appearing in this record—that tension is the only way of advancing strip; that tension is present in all the schemes; and that tension control is merely for uniformity of operation or a flywheel effect—the sole basis upon which the claims of patent '674 were allowed would have been non-existent."

So that again plaintiff stresses tension, but under the Altoona case tension is not patentable.

Accordingly, the same principles discussed in relation to the Reissue Patent 20,788 and the verdict thereon apply here and Patent 2,459,674 is accordingly invalid as a matter of law.

D. Patent 2,576,074

Claims 8 and 9 of this patent are in suit. The claims recite the same "combination" of joining strips end-to-end, cleaning, electroplating and washing, all in continuous fashion and under "tension," with the addition of a slack producer or looping tower at each end so that fresh lengths of strip may be cut off at the delivery end without interrupting the continuity of movement.

There is no patentable invention here. Prior patents, such as Coe 1,928,409 and Prentice 2,007,614, show slack producers or looping towers at the beginning and the end of other continuous strip treating processes. Dr. Dean conceded that the Coe patent shows that such mechanisms function in the same way for the same purpose in electrotinning lines. The patent is accordingly void under the rule of the Supermarket case and like decisions hereinabove cited; there is a mere congregation of old elements with no new or unexpected result.

Also, this patent is invalid because the claims asserted to cover defendant's operations were added more than a year after public use of such practices by defendant. The file wrapper of the patent shows that Claims 8 and 9, the only claims alleged to cover defendant's practices, were not presented until August 30, 1951. That was nineteen months after the filing of the original complaint in this action and thirteen months after the accused operations of defendant had been inspected by plaintiff and his representatives. Effective August 5, 1940, the two-year public use period was reduced to one year, Act of August 5,

1939, 53 Stat. 1212, 35 U.S.C.A. § 31.[2] The infringement charged here came after the year 1940 and since there was adverse public use more than a year prior to the presentation of the alleged invention to the Patent Office, this patent is void.

In such circumstances, the patent must be held void as a matter of law. Muncie Gear Works v. Outboard Co., 1942, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171. In that case, as in this, claims were presented late in the prosecution of the application in an endeavor to blanket adverse public uses. At that time, the permissible public use period was two years. The Supreme Court held, 315 U.S. at page 768, 62 S.Ct. at page 869:

"We think the conclusion is inescapable that there was public use, or sale, of devices embodying the asserted invention, more than two years before it was first presented to the Patent Office. * * * To sustain the claims in question upon the established and admitted facts would require a plain disregard of the public interest sought to be safeguarded by the patent statutes, and so frequently present but so seldom adequately represented in patent litigation."

III. In summary, on the issue of validity, in answer to the aggregation argument of defendant, counsel for plaintiff in his brief says:

"Reissue 20,788 disclosed an electrotinning process which, while continuous, was for a slow operation * * * and which produced tin plate with a matted surface. Patent 2,240,265, on the other hand, contemplates a high speed continuous electrotinning process producing tin plate with a bright surface. Dr. Dean testified that the individual steps of 2,240,265 coact and cooperate to produce a new unitary result and that the performance results from coaction of the steps rather than the aggregation of their several results.

"In Reissue 2,788 the combination is the treatment of a strip preparatory to electrotinning, electrotinning a strip thus suitably treated and carrying out certain of the steps continuously and without interruption. Patent 2,240,265 is that and more. There is also the brightening step to receive and treat the plated strip and the tension control which affects the entire line and permits the high speed continuous production of bright tin plate for the first time. The jury having found that the steps constituted a true combination, the language of the Supreme Court in Williams Mfg. Co. v. United Shoe Machinery Co., 1942, 316 U.S. 364, 367, [62 S.Ct. 1179, 86 L.Ed. 1537] is especially pertinent."

However, it is my view that aggregation rather than combination results. This is the result when claims of each patent are separately and independently considered and when all the patents are considered collectively. All of the evidence taken in its most favorable light for the plaintiff, with all disputed facts, questions and inferences resolved in his favor, leaves plaintiff's case wholly unproved. Fischer & Porter Co. v. Brooks Rotameter Co., supra. As in the Packwood case, this court's application of defining principles reveals a clear-cut case of lack of invention and consistent with controlling standards, the devices in suit plainly do not embody invention.

The presumption of validity of the patents does not aid plaintiff as it appears to this court that they are plainly invalid. Ryan Distributing Corp. v. Caley, supra. It means, as in Market Street Railway Co. v. Rowley, supra, 155 U.S. at page 629, 15 S.Ct. at page 228: "* * * The case is obviously within the principle, so often declared, that a mere carrying forward of the original thought, a change only in form, proportions, or degree, doing the same thing in

2. Now 35 U.S.C.A. § 102.

the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent. * * * "

In conclusion, under all of the evidence there was no room for reasonable men to differ. The verdict of the jury was in disregard of the evidence. The verdict will be set aside.

Two matters remain for but brief comment. On the issue of infringement the jury found for plaintiff. As the motion for judgment n. o. v. will be granted, the patents in suit are found invalid. They are thus incapable of supporting the charge of infringement. Cridlebaugh v. Rudolph, 3 Cir., 1942, 131 F.2d 795.

IV. Motion for New Trial

It is my view, as trial judge in this case, that the weight of the evidence and the relevant factors to be considered favor the defendant. It is unnecessary to discuss this issue at length, however, as judgment notwithstanding the verdict will be directed. It is believed proper to express my view of the issue of damages. On this phase of the case, defendant repeatedly sought to compel plaintiff to segregate his claim for damages to the patented subject matter in each of the four patents. Defendant cited Seymour v. McCormick, 1853, 16 How. 480, 57 U.S. 480, 14 L.Ed. 1024. It is felt that if on ultimate disposition of this case the patents are held valid, there should be a retrial on the issue of damages. Plaintiff's case was submitted to the jury on the theory of his attorneys that if any of defendant's steps in its tin line infringed any one of the claims involved in plaintiff's four patents, then plaintiff was entitled to damages to be computed by awarding plaintiff a percentage of gross sales of defendant's tin plate. Plaintiff's evidence on damages was based largely on Dr. Dean's testimony that a reasonable royalty is a sum equal to from 2 to 4% of the sales of defendant's tin plate from 1944 through 1949, being a period of six years. The jury fixed the reasonable royalty at 2½% of sales. During the trial, plaintiff's counsel was informed that his fail-

ure to segregate his damages rendered plaintiff's position untenable in the event that but one or less than all of plaintiff's patents were found valid and infringed. Plaintiff's position is revealed by Dr. Dean's testimony that the royalty and damages could not be apportioned as among the claims of the patents in suit. His testimony was that if any one of the claims or steps was infringed then plaintiff was entitled to the whole royalty. The court sees no factual basis for Dr. Dean's conclusion. For instance, supposing that Patent 2,459,674, covering the hot oil bath brightening apparatus, is ultimately found valid and infringed, in that event plaintiff should not be permitted to collect 2½% of total sales as a reasonable royalty under the evidence here. No evidence whatsoever was presented as to the value of the brightening apparatus patent from the other patents or what a reasonable royalty would amount to in dollars. Plaintiff chose to stand or fall on the proposition that all of his patents are valid and that all are infringed, but no production costs on the base strip were given, nor has plaintiff exploited his patents by the manufacture and sale of tin plate, nor by commercial use for his own account. He simply has granted licenses to other manufacturers at various negotiated amounts. The amounts received by plaintiff in granting licenses to other manufacturers have little or no probative value in fixing a reasonable royalty here. Such figures have been shown to be paid or agreed upon in the face of or by reason of threatened or pending law suits. The evidence in this case reveals that defendant has had a spectacular commercial success in the production and sale of tin plate in recent years. It is believed that the size of the verdict was influenced and largely based upon defendant's commercial success, as there was a singular lack of evidence upon which the jury could find a reasonable royalty. In the alternative, a new trial will be awarded in the event that the trial court is reversed on its conclusion as to judgment for the defendant notwithstanding the verdict for plaintiff.