361 F.2d 451
 149 U.S.P.Q. 659
 JONES KNITTING CORPORATION, the Russell Manufacturing
Company, Inc., Union Underwear Company, Washington Mills
Company, West Knitting Corporation, Oneita Knitting Mills
and P. H. Hanes Knitting Company,
v.
John E. MORGAN and John E. Morgan Patents, Inc., Appellants.
 No. 15360.
 United States Court of Appeals Third Circuit.
 Argued Dec. 7, 1965.
Decided May 18, 1966, Rehearing Denied July 7, 1966.
 
 Robert B. Frailey, Philadelphia, Pa. (Henry N. Paul, Jr., Stuart S. Bowie, Philadelphia, Pa., Paul & Paul, Philadelphia, Pa., of counsel, on the brief), for appellants.
 Roberts B. Larson, Washington, D.C., and Ernest R. von Starck, Philadelphia, Pa. (William R. Hinds, Andrew E. Taylor, Larson & Taylor, Washington, D.C., Morgan, Lewis & Bockius, Philadelphia, Pa., on the brief), for appellees.
 Before KALODNER, Chief Judge, and MARIS and FORMAN, Circuit Judges.
 KALODNER, Chief Judge.
 
 
 1
 Plaintiffs, a group of manufacturers of knitted goods, instituted this declaratory judgment action seeking a declaration of the invalidity of patent No. 2,839,909 issued for a knitted fabric, method and process of manufacture to the defendant John E. Morgan on June 24, 1958. Morgan, who had made the application on May 16, 1957, assigned his patent rights to the corporate defendant, John E. Morgan Patents, Inc.
 
 
 2
 The defendants denied invalidity and asserted a counterclaim, in Count I, for damages for infringement by all but one of the plaintiffs, and, in Count II, for treble damages by reason of a group boycott by all plaintiffs in violation of the Sherman Act, 15 U.S.C. 1.
 
 
 3
 The district court held the patent invalid. 244 F.Supp. 219 (E.D.Pa. 1965). It found that the plaintiffs had engaged in an illegal group boycott, but concluded that since the patent was invalid, the patentee suffered no damage. 244 F.Supp. 235 (E.D.Pa.1965).
 
 
 4
 This appeal followed.
 
 
 5
 On review, we are of the opinion that the patent involved is valid, except claims 14-18 insofar as they relate to a process for finishing the knitted fabric. As to those claims, it is admitted that the process described was already known in the prior art.
 
 
 6
 The patent involved, called the 'Morgan Patent', if for a knitted fabric which because of its light weight and warmth is particularly suited for use in the production of such winter garments as 'thermal underwear'. It is for a broad rib fabric knitted on 'weft' (circular) knitting machines as opposed to 'warp' knitting machines and is identifiable by the multitude of air-entrapping cells which are on both sides of the fabric. It is claimed that these cells keep their shape despite prolonged wear. By providing dead air spaces, it is claimed that the fabric achieves an enhanced insulating quality.
 
 
 7
 The sides of the air-entrapping cells are formed by the longitudinal ribs of the fabric; multiple tuck stitches form the bottom and top walls of these cells. These tuck stitches are utilized to break up the valleys and ribs of the broad rib fabric into individual air-entrapping cells.[1] In the words of the patent claim 'when these tuck stitches are 'knitted off' the loops so formed are stretched between adjacent longitudinal ribs and function to draw these ribs together at spaced apart points along the length thereof. This serves to accentuate the cellular construction which is produced. At the same time, the tuck strands underlie the ribs and function to brace and maintain the height of these ribs when the fabric is stretched or subjected to prolonged wear.' Additionally, the patent teaches that by knitting a tight fabric with heavy yarn this will aid the cells in keeping their three-dimensional character.
 
 
 8
 Prior to the Morgan patent the only fabric to gain consumer acceptance as possessing the 'thermal' qualities of light weight and warmth in cold weather was the 'Raschel' fabric earlier developed by the Nevy. This fabric, however, could only be produced on warp knitting machines. Consequently, knitters such as Morgan who had weft knitting machines which made circular knit fabrics had to buy their requirements from others. Morgan thus undertook the experimentation that resulted in his patent with the hope of developing an imitation of the Raschel fabric that could be made on a circular knit machine.
 
 
 9
 Insofar as the law of patentability is concerned, we only note the decisions of the Supreme Court in Graham v. John Deere Co., 381 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, both decided February, 21, 1966, for exposition and application of currently effective principles. These, because of their recency and completeness, need not be reiterated here.
 
 
 10
 We turn, then, to the determination of the validity of the Morgan Patent.
 
 INDEFINITENESS OF THE CLAIMS
 
 11
 The district court found the patent to be invalid because of the indefiniteness of the claims made by the patent. The court reached this conclusion because it found that the term 'heat-insulating' as used in the patent specifications and claims was a relative and comparative term which did not meet the statutory requirement.[2]
 
 
 12
 Regardless of the fact that the term 'heat-insulating' may be one of degree, there is abundant evidence on this record taken as a whole that when one skilled in the art reads the Morgan Patent, he would be capable of producing the patented fabric and of determining the limits of the patent. As we interpret the statutory standard, this is all the inventor need show. 35 U.S.C.A. 112.
 
 
 13
 As succinctly stated by the Second Circuit in Georgia-Pacific Corporation v. United States Plywood Corporation, 258 F.2d 124 (2 Cir. 1958), cert. den. 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112, the requirement of 35 U.S.C.A. 112 serves two primary pruposes:
 
 
 14
 '* * * those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial funcgion requires a balancing of these competing considerations in the individual case.' (258 F.2d, at 136).
 
 
 15
 In performing this balancing, Georgia-Pacific teaches that:
 
 
 16
 '* * * patentable inventions cannot always be described in terms of exact measurements, symbols and formulae, and the applicant necessarily must use the meager tools provided by language, tools which admittedly lack exactitude and precision. If the claims, read in the light of the specifications, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits the courts can demand no more.' (258 F.2d, at 136)
 
 
 17
 The cases cited by the plaintiffs, General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402 (1938); United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942); Fisher & Porter Co. v. Brooks Rotameter Co., 107 F.Supp. 1010 (E.D.Pa. 1952), aff'd 211 F.2d 400 (3 Cir. 1954), cert. den. 348 U.S. 871, are not inapposite to the teachings of Georgia-Pacific. It is clear that each case presents a different question, and the rule is not a technical one, but one made to protect the public.
 
 
 18
 Plaintiffs' witness Carroll Anderson testified that he believed the fabric put out by his company, Munsingwear, would infringe the Morgan Patent if the patent were upheld. We can assume that Anderson's willingness to make such a statement is based on his ability to determine the limits of the Morgan Patent. Plaintiffs' expert witness, Professor Shinn, also demonstrated ability to recognize the Morgan fabric. So also defendants' expert, Robert H. Lawson, was able to clearly identify an infringing fabric.
 
 
 19
 The testimony of Professor Shinn on the issue of invention also supports a finding that one skilled in the art can read the patent so as to know that in addition to the stitch structure a knitter would utilize a tight knit and a heavy yarn.[3]
 
 
 20
 Anderson testified that he had no difficulty in understanding the Morgan Patent and that he could identify the Morgan fabric as well as infringements.
 
 
 21
 The testimony of Mr. Lawson also illustrated that one skilled in the art can read the teachings of the patent without any reliance on the term, 'heat-insulating'.
 
 
 22
 These references suffice for us to state, in summary, our conviction that the evidence shows that the patent teaches with sufficient conciseness how the invention might be put into use and also gives sufficient warning to the would-be infringer of the patent's limits. The fact that the patent also uses a term capable of only relative definition is not fatal. See Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 43 S.Ct 322, 67 L.Ed. 523 (1923); Chicago Pneumatic Tool Co. v. Hughes Tool Co., 97 F.2d 945 (10 Cir. 1938), cert. den. 305 U.S. 643, 59 S.Ct. 242, 83 L.Ed. 436.
 
 THE PRIOR ART
 
 23
 The district court concluded that the Morgan Patent was anticipated in the prior art primarily on the basis of a fabric claimed to have been made by Carroll Anderson in 1933. But assuming similarily, more is required to constitute prior art under the statute.[4] The Reviser's Notes to Section 102, 35 U.S.C.A., make clear that the interpretation of 'known' by the courts assimilated it to 'publicly known'. See Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 7 L.Ed. 327 (1829).
 
 
 24
 The district court concluded that there was such a public knowledge and use becuase garments made from this Anderson fabric had allegedly hung on display racks in the Munsingwear Designs Division and that these racks were accessible to the public. Assuming that such a use is sufficient to meet the requirements of 'publicly known,' we conclude that the evidence is insufficient to support a finding of such use.
 
 
 25
 The defense of prior use is one that an alleged infringer, although free to raise, has the burden of persuasion. This burden is a heavy one, having been described by this Court as necessitating evidence that 'must be so strong as to remove all reasonable doubt thereof.' Smith v. Carter Carburetor Corporation, 130 F.2d 555, 560 (3 Cir., 1942). See also American Machine & Foundry Company v. Liggett & Myers Tobacco Co., 172 F.Supp. 12, 16 (D.N.J. 1959), aff'd per curiam, 272 F.2d 451 (3 Cir.). Similarly, the Supreme Court has stated that every reasonable doubt should be resolved against the one who avers this defense. Washburn & Moen Manufacturing Company v. Beat 'Em All Barbed Wire Company ('The Barbed Wire Patent Case'), 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892); Coffin v. Ogden, 85 U.S. (18 Wall.) 120, 21 L.Ed. 821 (1874). In a more recent reappraisal, the Supreme Court, in Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 8, 55 S.Ct. 928, 931, 79 L.Ed. 163 (1934) expressed itself thus:
 
 
 26
 'A patent regularly issued, * * * is presumed to be valid until the presumption has been overcome by convicing evidence of error. * * * (It is the) common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance.'
 
 
 27
 Plaintiffs' attempt to meet this burden, by proving display of the Anderson fabric, rests upon the testimony of Anderson himself, and that of Ruth K. Friedman, Jenny M. Lindh, and Mary Przybylka, who were employees of Munsingwear at the time these garments were allegedly displayed. The district court in its opinion recognized that the disposition testimony of the three employees of Munsingwear was entitled to no probative weight (244 F.Supp., at 224).
 
 
 28
 This leads us to recognize that the asserted 'public use' rests solely upon the oral testimony of Anderson. The fact that plaintiffs seek to carry their burden solely on the basis of oral testimony is not necessarily fatal to their case. However, because of the nature of this testimony, this court is under a duty to scrutinize it very carefully. The rationale behind such close scrutiny was cogntly stated in 'The Barbed Wire Patent Case', supra, 143 U.S. at 284-285, 12 S.Ct. at 447:
 
 
 29
 'We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants (in infringement suits) the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is torturned, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer.'
 
 
 30
 Viewing Anderson's testimony in this light, we cannot say that plaintiffs' evidence sustains their burden. Three factors must be noted in support of this conclusion: (1) the length of time that has elapsed between the event and the date of trial: Anderson was testifying to a recollection that is, from the date of his depositions, approximately twenty-five years old and concerns a matter which was not then directly related to his particular line of work, (2) there is a lack of any corroborating evidence: swatches of the fabric with a 1933 date were introduced into evidence, but this is not proof that the material was made into garments or displayed. No company records were produced nor was any witness whose employment with Munsingwear at that time involved the making and displaying of garments. In other instances the latter factor alone has been sufficient for a finding of failure to carry the burden of proof. Jepson v. Egley, 231 F.2d 947, 953, 43 CCPA 853 (1956); American Machine & Foundry Company v. Liggett & Myers Tobacco Co., supra; Radio Corporation of America v. Philco Corporation, 201 F.Supp. 135, 149 (E.D.Pa.1961), aff'd per curiam, 309 F.2d 397 (3 Cir. 1962). Moreover, Anderson cannot be considered a disinterested witness. He admitted that it was his belief, as well as that of Munsingwear officials, that the thermal wear fabric they were then producing infringed the Morgan Patent, that they were interested in nullifying the Morgan Patent, and that for these reasons they were assisting plaintiffs in this proceeding.
 
 
 31
 Further, Anderson's testimony as to the manufacture and display was not, as we view it, so clear that he was testifying from actual recollection on this score rather than from a reasoned belief.
 
 
 32
 In these circumstances, it cannot be said with sufficient conviction to justify negation of a patent that the evidence sustains the defense of prior anticipation. Cf. General Radio Company v. The Superior Electric Company, 321 F.2d 857 (3 Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659, wherein we specifically found corroboration of oral testimony, and cited Smith, Ex'r v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1937), indicating the decisive significance of corroboration.
 
 LACK OF INVENTION
 
 33
 The essence of the Morgan invention is the air-entrapping cells, which keep their shape even after prolonged wear, on both sides of a broad rib circular knit fabric. This is achieved through multiple tucking, utilizing heavy yarn and tight stitching. Such cells are present in the 'Raschel' fabric, but Morgan claims to be the first to produce this effect in a circular knit fabric. The district court concluded this result would have been obvious at the time to one of ordinary skill in the art.
 
 
 34
 The standard of invention was codified in 1952 and is set out in 35 U.S.C.A. 103.[5] This section was not meant to establish a new standard but merely to codify prior case law. This is the conclusion reached by the Supreme Court in Graham v. John Deere Co., supra. The court there reasoned that Congress had hoped by codifying the standard to emphasize 'non-obviousness' as the operative test of the section, rather than the less definite 'invention' language of Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683 (1850).
 
 
 35
 Graham also makes clear that the 'flash of genius' theory has no place in the requirement of invention. At footnote 7 of the opinion, the Court indicated that the theory originated from a misunderstanding of its opinion in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941), and that Cuno merely required that the device, and not the method, display invention. This is the view we entertained in R. M. Palmer Company v. Luden's Inc., 236 F.2d 496 (3 Cir. 1956). There we said that patentability shall not be negatived by the manner in which the invention was made but that rather the court must look at the end product to see whether a step beyond the prior art has been taken.
 
 
 36
 Admittedly, Morgan was not a skilled knitter, and many of the steps and experiments he performed were necessitated by this lack of skill. Regardless of the nature of his struggles, it is the end product that matters, and if this product advances the art a significant step, there is invention so long as that step is not obvious to those of ordinary skill in the art. The district court ignored the end product to concentrate on the inventor's technique. This can be observed in the court's own language: 'It is the means by which the idea is reduced to practice which must contain the elements of inventiveness as distinguished from mechanical skill and know how.' 244 F.Supp. at 225. This strikes to closely to the 'flash of genius' theory.
 
 
 37
 Examining the prior art, the district court concluded that the Morgan Patent was obvious at the time to one of ordinary skill in the art of knitting. The state of the prior art as found by the district court (Findings No. 42 and No. 43) consisted of the Raschel fabric, a '2 X 2 rib knit fabric with at least two tuck stitches on the front and no tuck stitches on the back' and 'a 2 X 2 rib knit fabric with pockets or cells formed on one side by plural tuck stitches and with one tuck stitch on the other side.' The court then concluded that to one of ordinary skill, given this prior state of the art, it would be obvious how to make the Morgan Patent by utilizing multiple tucking in such a way as to form cell pockets on both sides of the rib knit fabric. We cannot agree with this conclusion and find it to be error insofar as it is based on the testimony of Carroll Anderson and Professor Shinn.
 
 
 38
 While Anderson testified that given the prior art the Morgan Patent is obvious, his own experiments in 1952 and 1957 were unsuccessful and his own company decided to copy the Morgan fabric. There is also his deposition testimony, which was, however, denied by Anderson at the trial, that when he claimed the Morgan idea became obvious to him, he was already familiar with the Morgan Patent.
 
 
 39
 Professor Shinn, a recognized expert in the knitting field, with considerably more skill than the ordinary knitter, was unable to offer one constructive suggestion to inquiries concerning the manufacture of a Raschel type of fabric on a circular machine.
 
 
 40
 Here are two skilled knitters testifying to obviousness where one of them failed to produce the result through his own experimentation and the other did not offer constructive suggestions toward a solution. Where before the disclosure of a patent, two experts[6] are unable to foresee the solution provided by the patent, an inference of nonobviousness is not without justification. See Honolulu Oil Corporation v. Shelby Poultry Company, 293 F.2d 127, 131 (4 Cir. 1961). Cf. United States v. Adams, supra.
 
 
 41
 The evidence indicates that given the state of the prior art as found by the district court the Morgan invention is not obvious to one of ordinary skill in the knitting art, and that the invention represents a significant advance in the knitting field.
 
 
 42
 We do not rest this conclusion merely on the negative inferences to be drawn from the testimony of plaintiffs' experts, but also note the commercial success of the Morgan fabric, the long felt need for the invention, and the availability of the tools to produce the invention and the failure of others to achieve the result. The relevancy of such considerations is acknowledged in the statement of the Supreme Court in Graham v. John Deere Co., supra:
 
 
 43
 'Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. See Note, Subtests of 'Nonobviousness,' 112 U.Pa.L.Rev. 1169 (1964).'
 
 
 44
 Such consideration failed to tip the scales in favor of patentability in a companion case to Graham (86 S.Ct. 684, 15 L.Ed.2d, at 561) (plastic finger sprayer), but in United States v. Adams, supra, these factors were used to support a finding of nonobviousness (86 S.Ct. 708, 15 L.Ed.2d, at 580-581). See also, Hartford National Bank & Trust Company v. E. F. Drew & Co., 237 F.2d 594, 596 (3 Cir. 1956); Reiner v. I. Leon Cor., 285 F.2d 501, 504 (2 Cir. 1960), cert. den. 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961); Allen v. Standard Crankshaft & Hydraulic Company, 323 F.2d 29, 34 (4 Cir. 1963); Copease Manufacturing Co. v. American Photocopy Equipment Co. & Poray, Inc., 298 F.2d 772, 781 (7 Cir. 1961).
 
 
 45
 There is abundant and uncontradicted evidence, mush of it it supplied by plaintiffs' own witnesses, that while the tools existed to produce the Morgan fabric for a number of years and there was a real need for such a fabric no one came up with a commercially successful product until Morgan. We have already considered the evidence relating to the state of the prior art and the failure of two skilled knitters to arrive at or suggest in any manner a solution. That there was a need for a solution is well documented. Circular knit underwear mills were forced to buy their requirements from Raschel manufacturers and let their own machines stand idle. Thus there was great interest in the 1950's to develop a circular knit imitation of the Raschel fabric. Finally, there is the overriding commercial success of the Morgan fabric. The fabric was desired by the underwear salesmen and copied by competing manufacturers. In addition, the Navy's proposed specifications for circular knit waffle type fabric is based on the Morgan fabric. All of this is very strong evidence of invention entitling the defendants to a valid patent in the face of a lack of any convincing testimony, on the part of those skilled in the art, of obviousness.
 
 
 46
 Our conclusion as to the validity of the Morgan Patent will require the district court, on remand, to dispose of the issue of infringement raised in defendants' counterclaim, which it did not reach.
 
 THE GROUP BOYCOTT
 
 47
 Upon examination of the record, we agree with the fact-finding of the district court, 244 F.Supp. 235, 238, 239, that the twelve member plaintiff group did more than merely enter into an agreement to challenge the validity of the Morgan Patent; that the 'group was formed not only for purposes of bringing suit, but also for purposes of refusing to negotiate with Morgan for licenses', and that under the terms of the agreement 'the freedom of each plaintiff to deal freely with Morgan was restrained by the requirement of giving notice' of any dealing with Morgan to all the members of the group. We further agree with the district court's ultimate finding of fact that the plaintiffs engaged in a 'group boycott', and its conclusion of law 'that plaintiffs have restrained trade in violation of 1 of the Sherman Act.' Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 659-660, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Fashion Originators' Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).
 
 
 48
 Since the district court based its denial of damages on its ruling that the patent is invalid, our holding that the patent is valid will require it, on remand, to reach the issue of damages with respect to this phase of the litigation.
 
 
 49
 For the reasons stated, the Final Decree of the district court will be reversed, and the cause remanded with directions to proceed in accordance with this Opinion.
 
 
 50
 FORMAN, Circuit Judge (dissenting).
 
 
 51
 In the District Court, the patent phase of the case occupied thirteen trial days, in addition to oral arguments and sessions in chambers. Through the parties' use of the blackboard and their actual operation of the various types of knitting machines, the mechanics of commercial knitting, certainly of importance to the understanding of the problem at issue, where visually demonstrated to the District Court. With the benefit of these proofs, after listening to the testimony of the witnesses, and after considering the ocntents of the depositions, briefs and proposed findings submitted by both sides, it made fifty-three findings of fact and three conclusions of law, resolving the conflicts in the evidence in favor of, and holding for, the appellees.
 
 
 52
 Though error is found in one of the legal propositions employed by the District Court in deciding the question of invention, the thrust of the majority opinion is to question both the accuracy of and the weight to be given, findings of fact bearing on all three conclusions of law. Finding both inadequancies in the District Court's handling of the facts, and an error of law, the majority reverses.
 
 
 53
 In attacking the District Court's determination in such a manner, the majority, itself, must be convinced that the District Court's findings of fact are clearly erroneous.[1] The majority, in my view, has ruled quite properly that the facts support neither the District Court's conclusion that the Morgan patent is indefinite nor its conclusion that there was a public display of prior art indicative of an anticipation of the Morgan patent. However, on the District Court's legal conclusion that the Morgan patent is invalid for want of invention, because the process and fabric, the subject matter of the patent, is obvious to one skilled in the art, I am obliged to question whether the majority has demonstrated the clear error in the factual findings it attacks, and whether there has been a recognition of a number of findings directly supportive of this conclusion of law.
 
 
 54
 * The majority is critical of the District Court's conclusion that, given the state of the prior art, it would have been obvious to Morgan how to utilize multiple tucking in such a way as to form cell pockets on both sides of the rib knit fabric. Error is found in the District Court's conclusion, 'insofar as it is based on the testimony of Carrol Anderson and Professor Shinn,' due to the failure of both Anderson and Shinn to produce, or suggest a method for the production of, a Raschel imitation on a circular machine. The majority draws an adverse inference thereform and thus repudiates Anderson's and Shinn's credibility. Such action at the appellate level may only be justified by the absence of evidence upon which the District Court could have reasonably chosen to believe their testimony.
 
 
 55
 As to Anderson, the majority finds his failure to produce a Raschel imitation in 1952 and 1957, and an alleged conflict between his deposition and oral testimony concerning when he first knew of Morgan's work, sufficient to negate any belief in his testimony that, given the state of the prior art, the Morgan patent was obvious to one skilled in the art. Such a conclusion is reached despite at least tacit acceptance by the majority that Anderson had in 1933 made a fabric on a circular knitting machine which was in accordance with the knitting sequence of the Morgan patent. The majority expressed an objection to the line of evidence on this point only because the appellees failed to sustain their burden of showing that the fabric was publicly displayed in 1933, which was found to be the ground for disallowing this prior art as an anticipation of the Morgan patent, a conclusion with which I have expressed agreement. But this is an issue separate and distinct from the evidential value the Anderson 1933 fabric may be given on the issue of obviousness.
 
 
 56
 The District Court in its finding of fact No. 19[2] determines that Anderson produced a like fabric in 1933, a finding which is not contested and is amply supported in the record. In that finding as well as in findings No. 24, No. 26, No. 27 and No. 28,[3] the District Court underlines the basic similarity between the Anderson and Morgan fabrics. It determines in finding No. 31,[4] also amply supported by the record, that the differences between the Anderson and Morgan fabrics were matters of degree, such as the tightness of the knitting. And in findings No. 21 and No. 22,[5] the manner in which the Anderson fabric was put away in Munsingwear's files for any possible future use is described. All of these findings were based on evidence properly before the District Court and, in so adjudicating them, it stated that 'irrespectigve of whether the Anderson fabric is prior art, it certainly can be cited to indicate a lack of invention by Morgan.'[6] In view of the substantial evidence in support of such consideration, I am moved to give it appropriate weight.
 
 
 57
 The District Court obviously felt the evidence concerning the production of the Anderson fabric in 1933 more persuasive than the attempt to repudiate Anderson as a witness by turning his 1952 and 1957 failures against him. One basic reason for this is given in finding of fact No. 46.[7] In that finding the District Court determined that Anderson did in fact succeed again, in 1958, in producing a Raschel imitation, through the technique of multiple tucking on both the dial and cylinder sides of the circular knitting machine, and without reference to either the Morgan patent or a swatch of the Morgan fabric. Such a finding minimizes the evidential value of the 1952 and 1957 failures.
 
 
 58
 In accepting appellant's argument, that Anderson's deposition contradicts his oral testimony that he produced his 1958 fabric without reference to either the Morgan patent or a swatch of the Morgan fabric,[8] the majority overlooks two facets to the problem. Fist, even assuming the existence of the contradiction, the District Court had the right both to accept the oral statement over that in the deposition, and to have that choice respected by an appellate court. Second, Anderson's redirect testimony[9] itself clears up any doubt as to the presence of a contradiction between his deposition and oral statement, and underlines that it was only subsequent to his producing a Raschel imitation in 1958 that he became familiar with the Morgan fabric and patent.
 
 
 59
 The record thus amply supports the District Court's acceptance of Anderson as a knowledgeable witness on the question of obviousness. Even more importantly, Anderson's successes at producing a Raschel imitation on a circular knitting machine provide independent evidence of the obviousness of the Morgan patent.
 
 
 60
 As to the majority's attack on Professor Shinn's expertise, the fact that he, in answer to inquiries concerning the possible imitation of the Raschel fabric on circular knitting machines, was unable to offer a suggestion as to the manner in which the circular machines could be programmed to imitate Raschel, certainly justifies an inference of nonobviousness of the Morgan patent, just as another factor, such as the existence of the Anderson fabric, justifies an inference of obviousness. Neither category of inferences is conclusive on the question of invention. The District Court did not consider Professor Shinn's failure to offer constructive suggestions to the problem of critical importance. In light of the evidence concerning the 1933 and 1958 Anderson fabrics, as well as other factors relied upon, which will be discussed below, the District Court, in my view, did not abuse its prerogatives in failling to give this factor decisive weight.
 
 II
 
 61
 Aside from the findings relating to Anderson's success in producing a fabric akin to that claimed in the Morgan patent, the District Court made other findings of fact as to the state of the art, based on the record, which support the conclusion that the Morgan claims were obvious to one slilled in the art. A bit of further background material is in order. The circular rib knitting machine functions by the conjunctive operation of two banks of needles, the dial and the cylinder sides. The Raschel flat bed machine product was imitated by Morgan and Anderson through the technique of multiple tucking on both the dial and cylinder sides of the circular machine. Such tucking on both sides produced the air entrapping cells which gave the circular fabric its thermal characteristics, making it competitive with Raschel.
 
 
 62
 As against this background the District Court found in finding No. 40 that certain aspects of circular machine operation were well established in the knitting art. It had long been known that in knitting with the circular machines, the same operations could be performed on both the dial and cylinder sides of those machines, so as to give the same effect on both faces of the fabric.[10] It was also well known to persons skilled in the art that the tucking in a circular rib knit fabric acted as crossbars to give a waffle or porcketed effect, such tucking inherently performing the functions of bracing and stabilizing the fabric and thus limiting its width-wise stretch, albeit to a lesser or greater degree depending upon the tightness of the knitting. This is the substantiated conclusion of findings No. 35 and No. 37.[11] Findings No. 40, No. 35, and No. 37, together with other support in the record, wholly justify finding No. 32,[12] that prior to the Morgan patent it was well known in the art to knit circular rib knit fabrics with plural successive tucks on either the dial or cylinder side, or on both. It is further strengthened by evidence of concrete examples of such art[13] found by the District Court.
 
 
 63
 In this state of the commercial knitting art, at the time of the Morgan patent, what appears to have been the problem concerning the production of a thermal fabric on a circular knitting machine? An examination of the references to the record embodied in a portion of finding No. 16[14] indicates the following: Morgan viewed his problem as one of adjusting the machine to both tucking a heavy yarn three times on the cylinder side as well as the dial side and producing a fabric which would be tightly knit. He admitted that if a lighter weight yarn were to be used there would not be any problem with multiple tucking on both the dial and cylinder sides. The problem was not one of adveloping a new stituch arrangement. He, in effect, explains his contribution as the use of the heavy yarn and the element of tight knitting with known stitching patterns by adjusting the machine to both handle the tucking of the heavy yarn on the dial and cylinder sides and to allow for a tight knit. As indicated in finding No. 38,[15] it is thus the weight of the yarn and the tightness of the knit, rather than a unique stitching development, which enhances the thermal quality inherent to a greater or lesser degree in any circular knit fabric having pockets formed by tuck stitches. This is further illuminated by the District Court's findings indicating that Morgan referred to the stitching techniques of the long known so-called waffle fabrics as a basis for his work in 1956.[16] The thurst of the Morgan patent, however, is directed to the stitch programming of the circular rib knit machine. References to machine adjustment are scanty and, as the District Court points out in finding No 16,[17] machine adjustment is even characterized therein as obvious. With all the above-mentioned technological material before it, ample evidence emerges from this record to support the finding that Morgan's achievement was merely a mechanical act of machine adjustment to known knitting techniques and, therefore, obvious to one skilled in the art.
 
 III
 
 64
 The majority, besides resting on certain negative inferences which it draws from the testimony of appellees' experts, points to the commercial success of the Morgan fabric, the long felt need for the invention, and the availability of tools to produce the invention. It acknowledged, however, that these factors, as well as that of the failure of others skilled in the art to produce the subject matter of the patent, are merely secondary considerations, which may, in some instances, certainly be indices of obviousness or nonobviousness and, therefore, relevant. In the words of the Supreme Court:
 
 
 65
 '* * * These legal inferences or subtests do focus attention on economic and motivational rather than technical issues * * *. Such inquiries may lend a helping hand to the judiciary * * *. They may also serve to 'guard against slipping into hindsight,' * * * and to resist the temptation to read into the prior art the teachings of the invention in issue.'[18]
 
 
 66
 In effect they serve as the factors which tip the balance in cases where the technoligical elements do not alone point, with a degree of reason, to the disposition of the issue of inventiveness.
 
 
 67
 As is set forth in the above discussion, there appears to be substantial technological evidence in the record in support of the District Court's determination of obviousness. Thus, this is not a case where the secondary factors are particularly helpful. And, it also seems that certain of these collateral factors have been overemphasized, for example, the evidence of market demand. Despite the alleged idleness of the industry's circular machines and the claimed years of need for a Raschel substitute, it was not until May, 1956 that Morgan started his off and on experimentation. The inferences to be drawn from the secondary factors, such as this one, are mixed, at their very best. And even if onsidered as strongly favoring appellant, in my view, would not serve to offset the District Court's amply supported technological findings.
 
 IV
 
 68
 The majority finds that the District Court's statement-- 'It is the means by which the idea is reduced to practice which must contain the elements of inventiveness as distinguished from mechanical skill and know how,'-- misconceives the applicable legal standard on the question of invention. Such an approach is found to strike 'too closely to the 'flash of genius' theory.' The majority is of the view that the District Court by this statement has ignored the end product and has concentrated erroneously on the inventor's technique of experimentation as being adversely determinative. I, however, do not read the District Court's statement to resurrect an approximation of the discredited flach of genius theory. On the contrary, the District Court's immediately preceding remarks seem to recognize that experimentation does not detract from invention and, in this case is to be admired.[19] As I read it, the statement to which objection is made is but a reiteration of a protion of the introductory paragraph to the District Court's discussion on lack of invention, in which paragraph it carefully pointed out that in considering the merits of any end product 'mere skill is not invention' and there is a 'distinction between mechanical skill and invention.'[20]
 
 
 69
 The emphasis placed by the District Court on the necessity of some element of discovery being present was expressly approved in Graham v. John Deere Co.[21] The majority, itself, recognizes that the Supreme Court, in explaining its much misunderstood opinion in Cuno Engineering Corp. v. Automatic Devices Corp.,[22] emphasized that 'the subject matter sought to be patented must be beyond the skill of the calling' and that, properly considered, Cuno teaches that 'the device, not the (method of) invention * * * had to reveal the 'flash of creative genius'.'[23] The Court in Graham also quoted approvingly from its leading case of Hotchkiss v. Greenwood:[24]
 
 
 70
 'Unless more ingenuity and skill * * * were required than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of a skilled mechanic, not that of the inventor.'[25]
 
 
 71
 And in characterizing the relationship between Hotchkiss and Section 103 of 35 U.S.C. the Supreme Court emphasized that 'while the clear language of 103 places emphasis on an inquiry into obviousness, the general level of innovation necessary to sustain patentability remains the same.'[26]
 
 
 72
 The District Court recognized all the difficult problems inherent in a case such as this. Its conclusion of law on lack of invention is governed by the standard of obviousness.[27] Its textual discussion on this question of inventiveness contains a number of specific references to obviousness as being determinative, along with an explicit recognition of the manner in which hindsight as a vantage point may distort the process of judgming whether an alleged invention is obvious.[28] I cannot agree that the statement singled out by the majority, when read either alone, or with the other components of the District Court's opinion is indicative that this case was decided on a legal theory approximating that of the discredited 'flash of genius'. On the contrary, the District Court merely recognized the factor which Hotchkiss first spelled out, Cuno later embellished, and Graham more recently has approved, namely, that an element of discovery is essential to patentability; that be it associated with the idea or the end result, the idea's reduction to practice, mechanical skill and know how without the requisite element of discovery will not suffice to make the end product patentable.
 
 
 73
 Finding no error of law on the issue of invention and ample support in the record for the District Court's factual findings of both Anderson's success in producing a Raschel imitation and the mechanical nature of Morgan's efforts, this court does not, in my view, have a sufficient basis upon which to overturn the District Court's conclusion that the Morgan patent was obvious to one skilled in the art and, thus, not invention. I, therefore, find myself in respectful disagreement with the conclusion of the majority that the judgment of the District Court should be reversed. I would affirm it.
 
 
 
 [1]
 In this respect, Fig. 3 of the drawings of the Morgan Patent is incorrect as it shows no tuck stitches as described or claimed. Pre-Trial Order, Admitted Fact No. 11
 
 
 [2]
 The statute, as here relevant, reads:
 'The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.' 35 U.S.C.A. Sec. 112.
 
 
 [3]
 'Q. What are the factors which govern whether it is a tight cell or a loose cell?
 'A. Tightness of the knit and the size of the yarn are factors.
 'q. Would you say in your judgment that that would be something that any knitter would know, if he wanted to tighten up the tuck stitch he could do it by knitting tighter or using heavier yarn?
 'A. Well, I believe so. I am confident that is true.'
 
 
 [4]
 '102. Conditions for patentability; novelty and loss of right to patent
 'A person shall be entitled to a patent unless--
 '(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, * * *.'
 
 
 [5]
 '103. Conditions for patentability, nonobvious subject matter
 'A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, 1, 66 Stat. 798.'
 
 
 [6]
 There was also evidence that a third skilled knitter, Mr. Paul, was asked to find a solution, but it is clear exactly how far he had proceeded in his work
 
 
 [1]
 Hazeltine Corporation v. General Motors Corporation, 131 F.2d 34, 37 (3 Cir. 1942), and Supreme Court cases cited therein
 
 
 [2]
 Jones Knitting Corp. v. Morgan, 244 F.Supp. 219, 230 (E.D.Pa.1964):
 '19. One of Carroll R. Anderson's first jobs after coming to Munsingwear was to knit some fabrics for the Design Department for use in making fancy sweaters. The chief designer asked him to make something like 'a waffle knit.' (1) In compliance with this request Anderson made several fabrics, but the ones he thought most appropriate as a waffle fabric were made with a 2 X 2 needle set up on a rib knit circular knitting machine with alternate groups of three tuck stitches and three knit stitches on each side and spaced by a single knit stitch. (PX 38A). These fabrics were knitted in accordance with the knitting sequence shown in the knitting diagram which is Fig. 2 of the Morgan patent. (2)
 '(1) N.T. pp. 787, 788, 789; PX 151, p. 13.
 '(2) PX 38A (The swatches); PX 39 (diagram); N.T. 789-793; Ditzler, Morgan's knitter, admitted the knitting sequence is the same. PX 155, pp. 235-237 and PX 156, pp. 31, 32; PX 151, pp. 19, 20; PX 40 (photograph).'
 
 
 [3]
 Id. at 230-231
 
 
 [4]
 Id. at 231
 
 
 [5]
 Id. at 230:
 '21. The completed Anderson fabric made in 1933 became a permanent part of Munsingwear's reference files in 1933 when swatches of the waffle fabric (PX 38A) were placed on a reference card in the reference files.
 '(PX 151, pp. 9-12; N.T. 806, 807).'
 '22. The reference file at Munsingwear in which the card and swatches PX 38 and PX 38A were located contains both fabric swatches for potential commercial production and swatches of fabrics which are currently or were in production.
 '(PX 151, pp. 163-168, Anderson Deposition; N.T. 929, 994).'
 
 
 [6]
 Id. at 227
 
 
 [7]
 Id. at 233:
 '46. The fabric of DX 99 was produced by Carroll R. Anderson without any knowledge of the Morgan patent or any fabric produced by Morgan. This fabric is knitted the same as the knitting sequence shown in Figure 2 of the Morgan patent and the 1933 PX 38A fabrics. (N.T. 846). The men's underwear division of the Munsingwear Company requested Mr. Anderson to make or have made a circular knit thermal fabric. (N.T. 944). Several different fabrics were made according to Mr. Anderson's instructions. (N.T. 944; PX 151, p. 132). Then the merchandising people brought in a Jones Knitting Company garment which had tucks on only one side, and Mr. Anderson thought it could be improved by making it perfectly balanced by adding tucks to the other side. (N.T. 941, 974). DX 101, dated August 29, 1958, is the record of the original piece which was made. (N.T. 941). Although a Mr. Woodhead actually made the fabric, it was made at Mr. Anderson's specific request, and he was fully familiar with the development. (N.T. 954, 955, 974). Mr. Anderson did not see the Morgan patent until November 25, 1958, when it was sent to him by Mr. Woodhead. (N.T. 922; DX 97). Mor had he seen any fabric of the type marketed by Morgan. (N.T. 949, 976, 977, 1008, 1009). The fabric DX 99 which had been made pursuant to Mr. Anderson's instructions was adopted by Munsingwear, and sales commenced on August 3, 1959. (PX 151, p. 135; N.T. 974). Mr. Anderson had seen the Morgan patent at the time the DX 99 fabric was adopted for sale, but he had not seen it or any corresponding fabric at the time the DX 99 fabric was initially made.'
 
 
 [8]
 Appellant presents its argument, that Anderson's deposition contradicts his oral statement, by reference to portions of the record which tend to give considerably less than a complete picture of all facets of the issue
 
 
 [9]
 Trial Transcript, pp. 975-78
 
 
 [10]
 Jones Knitting Corp. v. Morgan, supra note 2, at 232. Finding of Fact No. 40 reads:
 '40. It has long been known in the art that in knitting with rib machines the same operations can be performed on both faces of the fabric so as to give the same effect on both faces of the fabric, and specifically that groups of adjacent tuck strands could be formed on each face of a rib knit fabric.
 '(N.T. 1305; PX 200, p. 138, example IX; N.T. 1178-1181; PX 208, p. 3, lower right-hand figure).'
 
 
 [11]
 Ibid:
 '35. Prior to the time the alleged invention here involved was made, it was known to persons skilled in the knitting art that tuck stitches in a rib knit fabric would act as crossbars to give a waffle or pocketed effect.
 '(Morgan, N.T. 667-671; Morgan PX 157, pp. 12, 13, 48, 51, 88; Morgan, PX 127, pp. 283-286; Ditzler PX 155, p. 271).'
 '37. Prior to the time when the alleged invention was made, there was nothing new or unobvious in using either single or plural tuck strands in a rib knit fabric to brace or stabilize the fabric and thus limit its widthwise stretch. Regardless of the purpose for which tuck strands are used, they inherently perform this function in a lesser or greater degree depending upon the tightness of knitting. (N.T. 1369, 1370, 1519, 1523, 1533, 1534, 1547, 1548, 1550-1553, 1613, 1614). Furthermore, tucks for this specific purpose have been known since at least 1907, the date of publication of the German patent PX 192, 192A. This specific purpose or function is stated on pages 1, 2 and 7 of the translation, PX 192A. Therefore, neither the bracing purpose nor the bracing function of the tuck stitches as described in the Morgan patent is novel.'
 Appellant claims that finding No. 37 is in error for Professor Shinn testified that tucking in certain fabrics called snuggies does not brace the ribs of the fabric to limit widthwise stretch, and that it was testified that tucks were incorporated in snuggies merely to shape the fabric and add a little bulk. Appellant misconceives the import of finding No. 37. All the District Court determined was that 'in a lesser or greater degree depending upon the tightness of the knitting' would one produce such an effect. In snuggies, with their loose knit, effective bracing and stabilization would not be expected, and the District Court did not find otherwise.
 
 
 [12]
 Id. at 231:
 '32. Prior to the time when the alleged invention here involved was made, it was well known in the art to knit rib fabrics with plural successive tucks on either the dial or cylinder needles, or on both. It was a simple matter of machine adjustment to arrange a machine to tuck two times instead of once, or three times instead of twice.
 '(Lawson, N.T. 145; Anderson, N.T. 816, 817; PX 200, p. 138, example IX shows two successive tucks on each face; Frailey, N.T. 2195; PX 208, p. 3; Brennan, N.T. 1471, 1473; PX 198, Rab article).'
 
 
 [13]
 Id. at 231, 233-234;
 '33. In the prior art publication PX 200, the fabric on page 138 designated as 'Double French Rack', example IX, is a rib knit fabric having multiple tucks on each face in adjacent groups. As shown in the knitting diagram on page 138, the dial needles tuck for two courses while the rib needles knit; then for one course both the dial and cylinder needles knit; then the cylinder needles tuck for two courses while the dial needles knit; then for one course both the dial and cylinder needles knit; and then the sequence is repeated. The example specifies that the yarn be 2/14s worsted, which would result in a heavy fabric. (N.T. 1097, 1101). The multiple tuck strands would limit the widthwise stretch of the fabric and would add to the warmthgiving properties of the fabric. (N.T. 1552).
 'The fabric described on page 138 of PX 200 is a 1 X 1 rib, which is stated in the patent to be within the scope of the invention.'
 '44. There are in evidence two fabrics made by Michael LaCorte, a knitter for Beaunit Mills, Inc., prior to 1953. The fabrics, their knitting diagrams, and a stipulation of counsel were combined as PX 299. The fabrics were made while Mr. LaCorte was 'fooling around' with a knitting machine. He thought they were attractive, and might be useful as either outerwear or underwear. For this reason be saved the swatches. The fabrics were never manufactured or sold. The fabrics have three tucks on one side and one tuck on the other side and are a 2 X 2 rib setup. These fabrics have a waffle effect, or pockets, or cells, etc., at least on the side which incorporates the multiple tuck stitches. These are 'air-entrapping cells' constructed in the exact manner disclosed in the Morgan patent. The only difference between these fabrics and the Morgan patent is that these fabrics incorporate one tuck stitch or strand on one side whereas the Morgan patent discloses two or more tuck stitches or strands.'
 '45. The fabric of DX 1 is a 2 X 2 rib knit fabric having three consecutive tucks on the dial side and no tucks on the cylinder side. (DX 226, p. 69). This fabric was made by Lloyd Kranz, knitter for Jones Knitting Corporation, in his spare time and was completed around December, 1956. Mr. Kranz did not see any fabric manufactured by Morgan until at least August, 1957.
 '(DX 226, pp. 71, 72, 73, 122).'
 '47. Back in 1935 or 1936, Emmitt Murray made a rib knit fabric having a plurality of tuck stitches on each side. Specifically the fabric had ribs on one side which were three needles wide and ribs on the other side which were two needles wide. There were at least two successive tuck stitches bridging the valleys on each side of the fabric. (N.T. 1197-1199). The knitting diagram for the fabric is set forth in the document PX 223, and specifically on the page marked as PX 223a. A revised knitting diagram in the form shown in the Morgan patent is in evidence as PX 280. The fabrics themselves could not be located.
 '(N.T. 1230).'
 Appellant attacks No. 44 on the ground that it was placed in evidence via a stipulation, thus depriving the District Court from seeing a witness testify about the fabric. The existance of the stipulation, however, would seem to preclude any attack on the truth of the subject matter of the finding.
 Appellant also attacks No. 47, on the ground that the fabric itself was not produced, merely an undated entry in a notebook and the recollection of a witness, Murray. The veracity of the testimony no doubt may be challenged, but the District Court had a right to believe the witness, plainly subject to both the Court's view and to cross-examination.
 
 
 [14]
 Id. at 229-230:
 '16. * * * (Morgan, PX 157, pp. 55, 58, 60, 152; Morgan, PX 127, pp. 290-293; Ditzler, PX 155, pp. 189-192, 226, 239-240, 249, 251, 275; Ditzler. PX 156, pp. 28-31, 33, 34, 43). * * *'
 
 
 [15]
 Id. at 232:
 '38. To a greater or less degree depending on the size of the yarn and the tightness of the knit, any rib knit fabric having pockets formed by tuck stitches will entrap air to impart insulating properties to the fabric regardless of whether the tuck stitches or pockets were provided for that specific purpose or for some other purpose.
 '(N.T. 1613, 1614).'
 
 
 [16]
 Id. at 229:
 '12. Prior to the time the alleged invention here involved was made, Morgan knew of old fabrics which were referred to as 'waffle' fabrics. They were rib knit fabrics incorporating tuck stitches to give waffle-like depressions or pockets in the valleys between the ribs on at least one side of the fabric. Morgan stated that the appearance of these old fabrics was much like the Raschel fabric, and he requested Ditzler to produce such a fabric having the waffle-like depressions or pockets.
 '(Morgan, N.T. 666-671; Morgan, PX 157, pp. 10, 12, 13, 48, 51, 87, 88; Morgan PX 127, pp. 283-286; Ditzler, PX 155, p. 271; PX 25; PX 212; PX 217).'
 '13. In the making of the alleged invention here involved, Morgan requested Ditzler to produce a fabric having a so-called waffle stitch or depressions, preferably on both sides. Ditzler knew now to get a waffle effect on one side by means of dial tuck stitches or strands.
 '(Ditzler, PX 155, p. 271).'
 Appellant's attack on findings No. 12 and No. 13 as not supported by the record is hollow. An examination of the references cited in the findings themselves demonstrates the ample support in the record for them.
 
 
 [17]
 Id. at 229-230:
 '16. Although Morgan and Ditzler encountered some difficulty in knitting the first fabric, these difficulties essentially involved learning how to adjust the machine and adjusting the machine for commercially feasible operation. (Morgan, PX 157, pp. 55, 58, 60, 152; Morgan, PX 127, pp. 290-293; Ditzler, PX 155, pp. 189-192, 226, 239-240, 249, 251, 275; Ditzler, PX 156, pp. 28-31, 33, 34, 43). The patent itself is not directed to such problems or their solution. It contains no instructions for the necessary machine adjustment and therefore does not solve the alleged problems which were encountered. The patent merely says that such adjustments are obvious.
 '(Morgan patent, lines 49-57).'
 
 
 [18]
 Graham v. John Deere Corp., 383 U.S. 1, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966)
 
 
 [19]
 Jones Knitting Corp. v. Morgan, supra note 2, 244 F.Supp. at 225:
 'If the court is about to declare the Morgan patent invalid because of lack of invention, it affords little comfort to express admiration for Morgan's dogged determination in the face of the stubborn resistance and pessimistic attitude of his knitter Ditzler. But the stubbornness and belief in an idea alone are not invention.'
 
 
 [20]
 Id. at 225:
 'Mere skill is not invention and the distinction between mechanical skill and invention is whether what was produced was obvious to persons skilled in the art and acquainted with common knowledge in the art at the date the device was created.'
 
 
 [21]
 Supra note 18
 
 
 [22]
 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58 (1941)
 
 
 [23]
 Graham v. John Deere Co., supra note 18, 383 U.S. at 15, n.7, 86 S.Ct. at 692
 
 
 [24]
 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850)
 
 
 [25]
 Graham v. John Deere Co., supra note 18, 383 U.S. at 11, 86 S.Ct. at 690, citing Hotchkiss v. Greenwood, 52 U.S. (11 How.), 248, 267, 13 L.Ed. 683 (1850)
 
 
 [26]
 383 U.S. at 4, 86 S.Ct. at 686
 
 
 [27]
 Jones Knitting Corp. v. Morgan, supra note 2 at 234
 
 
 [28]
 Id. at 225